**Kevin DAY, Plaintiff,**

v.

**STAPLES, INC., Defendant.**

**Civil Action No. 06–10647–JLT.**

United States District Court,
D. Massachusetts.

Feb. 7, 2008.

Bryan J. Day, Major League Baseball Properties, Inc., New York, NY, for Plaintiff.

Ariel D. Cudkowicz, Krista G. Pratt, Seyfarth Shaw, Boston, MA, for Defendant.

## MEMORANDUM & ORDER

TAURO, District Judge.

## I. INTRODUCTION

Plaintiff Kevin Day ("Day") alleges that he was wrongfully terminated by Defendant Staples, Inc. ("Staples") after engaging in activities protected by the Sarbanes–Oxley Act. Plaintiff advances four claims: (1) violation of the Sarbanes–Oxley Act; (2) breach of contract; (3) promissory estoppel and (4) wrongful discharge in violation of public policy.

Defendant moves for summary judgment on all four claims. Plaintiff moves for summary judgment on the violation of the Sarbanes–Oxley Act, the breach of contract, and the wrongful discharge claims. For the following reasons, this court ALLOWS Defendant's *Motion for Summary Judgment* [# 41] and DENIES Plaintiff's *Motion for Partial Summary Judgment* [# 45].

## II. FACTUAL BACKGROUND

The factual record commences with Plaintiff's application for a position with Defendant. On April 21, 2005, Plaintiff spoke by telephone with corporate recruiter Cheryl Louie ("Louie"), regarding a Reverse Logistics Analyst position.[1] Louie's notes from the call show that the position could include up to 70 percent travel.[2] During Plaintiff's interview on April 28, 2005, both Louie and Mary–Ellen Julio ("Julio"), Manager of Staples' Reverse Logistics Department, described the job as requiring 70 percent travel.[3] The remaining 30% of Plaintiff's work hours would be completed at Staples' office in Framingham, Massachusetts.[4]

On May 6, 2005, Staples sent Plaintiff an offer letter, which set out his monthly salary and certain requirements.[5] Among other things, the letter required that Plaintiff sign an attached Code of Ethics ("Code") as a condition of employment.[6] The Code stated in relevant part:

Staples will not tolerate retaliation against anyone who in good faith reports a violation or potential violation of this Code. This means that you will not be disciplined, fired, or discriminated against in any way for voicing ethical or legal concerns or reporting violations so long as you act honestly and in good faith ... Staples will not discipline, discriminate against, or retaliate against any associate who reports a complaint or concern in good faith.[7]

The offer letter also stated, "This letter, along with the enclosures, contains our complete offer of employment and in no way changes your status as an at-will employee."[8] The enclosures included both an Associate Handbook and the Code of Ethics. The letter said nothing about travel or Plaintiff's primary workplace. After receiving the letter, Plaintiff did not speak to anyone at Staples about travel time associated with the job.[9]

On May 22, 2005, Plaintiff graduated from University of Massachusetts, Amherst.[10] The next day, he arrived at Staples' headquarters and accepted their offer of employment.[11] He also signed a document titled "Code of Ethics Acknowledgment." [12]

The Associate Handbook contained a section entitled "Introductory Period." This explained that the first ninety days of an associate's active employment are con-

---

1. Plaintiff's Statement of Undisputed Material Facts [# 47], ¶ 4 ("Pl.'s Statement").

2. *Id.*

3. *Id.* at ¶ 9.

4. Compl. at ¶ 7.

5. Offer Letter to Kevin Day from Cheryl Louie dated May 6, 2005, Serafyn Aff. [# 44], Ex. A ("Offer Letter").

6. *Id.*

7. Compl., Ex. C.

8. Offer Letter.

9. Deposition of Kevin Day, Volume II, 192:17–23, Serafyn Aff. [# 44], Ex. B. ("Day Dep. II").

10. Compl. at ¶ 25.

11. *Id.* at ¶ 17.

12. *Id.*

sidered "the introductory period. This allows ... the company an opportunity to observe and evaluate the associate's performance. Since employment is at the will of the company and of the associate, completion of the introductory period is not a guarantee or a right to continued employment."[13]

Further, the Handbook stated in uppercase, underlined print, "I also understand that this handbook is not a contract of employment, and that employment with Staples is on an at-will basis. As such, I realize that I (or the Company) may end the employment relationship at any time, for any reason."[14]

During Plaintiff's employment, he lived with his parents in West Yarmouth, Massachusetts.[15] The commute from West Yarmouth to the Staples offices in Framingham was approximately 95 miles each way.[16] Plaintiff estimates that his commute cost approximately $30.00 per day, or $600.00 per month, for gas.[17] He also notes that the value of his vehicle depreciated due to the fact that his commute put 1,000 miles on his car every week.[18]

As a Reverse Logistics Analyst, Plaintiff's was charged with "[m]onitoring the reports, analyzing the data, and getting to the root cause of why returns either are being picked up and not being processed, why customers aren't receiving their credit."[19] He was also tasked with improving the processing of returns.[20] Plaintiff's supervisor was Mary–Ellen Julio.[21]

On June 13, 2005, Plaintiff traveled to California for two weeks of training with human resources personnel, including Wendy Watanabe ("Watanabe") and Judith Gutierrez ("Gutierrez").[22] Plaintiff later testified in his deposition that he had a "rocky relationship" with Watanabe and that they "weren't compatible".[23] When Plaintiff returned from his training, he told Julio that the entire trip was a waste of time.[24]

On July 5, 2005, Plaintiff exchanged emails with Julio regarding returns from a courier, SpeeDee Delivery.[25] Plaintiff expressed frustration at his failure to get the attention of SpeeDee employees, particularly given the large number of outstanding pick-up orders at this account. He felt as if he had been "brushed off," and given the telephonic equivalent of a blank stare.[26] Julio advised Plaintiff that he should not "jump to conclusions," nor "assume to know the whole situation."[27] Plaintiff replied, "Sometimes I may come across as rash, but it is all in an effort to get things taken care of, finally ... Perhaps my downfall is that I say things that need to be said and sometimes don't worry about if

13. Associate Handbook, Serafyn Aff. [# 44], Ex. D.

14. *Id.* at Ex. C.

15. Compl. at ¶ 26..

16. *Id.* at ¶ 28.

17. *Id.*

18. *Id.* at ¶¶ 28–30.

19. Deposition of Mary–Ellen Julio, 164:18–21, Serafyn Aff. [# 44], Ex. E ("Julio Dep.").

20. Job Description, Serafyn Aff. [# 44], Ex. F.

21. Offer Letter.

22. Day Dep. II at 121:1–2.

23. *Id.* at 167:16–17.

24. Julio Dep. at 33:4–6.

25. Email Exchange between Julio and Day, dated July 5, 2005, Serafyn Aff. [# 44], Ex. K ("Email Exchange").

26. *Id.*

27. *Id.*

somebody is hurt or embarrassed, especially if they are in fact to blame."[28] Julio responded to "just stick to the facts," and that "it is not us against them, we have to make this work as a TEAM."[29]

On July 14, 2005, Plaintiff spoke with a dissatisfied customer regarding the return of a scanner.[30] Upon learning that the customer was not going to return it, Plaintiff informed him of an inexpensive supplementary machine, sold by a competitor of Staples, that would solve the customer's problem.[31] After Julio heard of this consultation, she expressed concern to Plaintiff about recommending a competitor's product, and reminded him that his job was to find out whether the customer's return had been completed.[32] Plaintiff stated that he did not believe he did anything wrong and characterized Julio's concerns as "nit-picky."[33]

Their subsequent conversation lasted approximately one hour and touched on other issues.[34] For instance, Plaintiff stated his belief that the department was inappropriately canceling and reissuing returns to manipulate the number of days a return had been outstanding ("aging days").[35] He believed that this practice amounted to fraud on Staples shareholders, and was in place so that Julio would look good for her bosses.[36] Julio explained that most of the couriers did not have the ability to reprint the paperwork; cancellation and reissuance were the only practicable solution.[37] During this conversation, Julio felt that Plaintiff refused to accept her explanations.[38]

Following the July 14 conversation, Julio called her supervisor, George Zalitis ("Zalitas"), to seek guidance regarding Plaintiff.[39] Since Zalitas was not available, Julio spoke to Ann Marie Bourque ("Bourque"), the human resources representative from the Reverse Logistics Department.[40] Julio expressed concerns that Plaintiff was refusing to follow instructions and that he had indicated that other members of the team were useless.[41] Julio also told Bourque that she had overheard Day read Staples' internal log over the phone to customers, rather than addressing questions to the internal personnel who wrote the logs.[42] She was worried about what Plaintiff would say while on the phone with customers.[43] Since Day was still in his probationary period, Julio recommended his termination.[44] Bourque suggested that Julio document the issues in writing, which she did.[45]

---

28. *Id.*

29. *Id.*

30. *Id.* at ¶ 123; Day Dep. II, 135:10–17, 136:18–24.

31. Testimony of Kevin Day at the Dep't of Labor, 84:3–22, Serafyn Aff. [# 44], Ex. G ("Day DOL Test.").

32. Testimony of Mary–Ellen Julio at the Dep't of Labor, 598:19–25, 599:1–5, Serafyn Aff. [# 44], Ex. H ("Julio DOL Test.").

33. Pl.'s Statement at ¶ 126; Julio DOL Test. at 599:6–7.

34. Day Dep. II, 146:3–5; 147:12.

35. Julio DOL Test. at 599:16–25; 600:1–3.

36. *Id.* at 599:24–25, 600:1.

37. *Id.* 600:2–5, 11–17.

38. *Id.* at 600:25, 601:1–12.

39. *Id.* at 606: 8–13, 16–18.

40. Pl.'s Statement at ¶ 142.

41. Julio DOL Test. at 607:2–7.

42. *Id.* at 607:10–15.

43. *Id.* at 607:8–9.

44. *Id.* at 608:4–6.

45. *Id.* at 608:2–3.

Following the meeting with Bourque, Julio summarized Plaintiff's performance and attitudinal problems in the "Kevin Day Performance Evaluation."[46] The evaluation noted several areas in which Plaintiff had not met expectations: Goals/Teamwork; Representing Staples/Customer Follow up; Assumptions/Lack of Understanding; Professionalism; Insubordination. Specific concerns included Plaintiff's excessive number of "open returns;" his inappropriate conversations with customers; his refusal to follow directions; his various derogations of other employees; other employees' negative feedback about Plaintiff; and his "complete lack of respect in regards to all Staples management and peers."[47]

On July 15, 2005, Day delivered a letter ("Day Letter") to Doreen Nichols ("Nichols"), Director of Associate Relations and Diversity in Staples' Human Resources Department.[48] During their conversation, Nichols advised Plaintiff not to send the letter electronically "since it could get forwarded to the wrong people and make Plaintiff look bad."[49] Instead, she offered to pass it along to the appropriate personnel.[50] She later forwarded the letter to Ellen Kruse ("Kruse"), Staples' Regional Director of Human Resources, and Nan Stout, Staples' Vice President of Ethics.[51]

The Day Letter had two sections, entitled "Misrepresentations in Job Descrip-tion" and "Forced Participation in Fraudulent Activity."[52] In the first section, Plaintiff indicated that he had understood that the job would require 70% travel, and that he had moved in with his parents 95 miles away based on that understanding.[53] In the second section, Plaintiff expressed the concern that he was being compelled to commit fraud at the risk of losing his job.[54] Specifically, Day refused "to take part in the mass canceling and reissuing of pickup orders ... [which led to the perpetration of] hundreds, if not thousands, of cases of inaccurate reporting of figures, accounting fraud and general unethical behavior."[55]

On July 18, 2005, Julio emailed Watanabe and Gutierrez, who conducted the training sessions in California, to ask about Plaintiff's performance.[56] Watanabe responded with a host of concerns: in the first week, Plaintiff "[d]id not take initiative to be out on the floor for the check in process even when he was asked;" "[w]as not hands on during the check in process;" "questioned the process overall—was argumentative and sometimes making offensive comments about the process and other's [sic] ability to do their job."[57] In his second week, Watanabe indicated Plaintiff "[s]howed some interest by asking questions about processing returns and about how we take care of our data processing."[58] Gutierrez likewise noted that Plaintiff "was interested in finding out spe-

46. Kevin Day Performance Evaluation, dated July 14, 2005, Kevin Day Aff. [# 51], Ex. U.

47. *Id.*

48. Letter to Human Resources by Kevin Day, dated July 15, 2005, Serafyn Aff. [# 44], Ex. P. ("Day Letter").

49. Pl.'s Statement at ¶ 164.

50. *Id.* at ¶ 165.

51. *Id.* at ¶ 167.

52. Day Letter.

53. *Id.*

54. *Id.*

55. *Id.*

56. Mary–Ellen Julio Email to Wendy Watanabe & Judith Gutierrez, dated July 18, 2005, Serafyn Aff. [# 44], Ex. N.

57. Wendy Watanabe Email to Mary–Ellen Julio, dated July 18, 2005, Serafyn Aff. [# 44], Ex. N ("Watanabe Email").

58. *Id.*

cifics, but then disregarded the facts and inputted his belief as to how it should be done or what he thought it would take to make things work better." Gutierrez also reported that Plaintiff "was eager to get hands on training" and "appeared to really want to get a full understanding of everything...." [59]

Later that same day, Plaintiff met with Bourque and Kruse to discuss his unrelenting concern about Staples' supposedly fraudulent returns process. [60] Kruse told Plaintiff that she thought his fraud allegations were erroneous, but she and Bourque agreed to conduct an investigation. [61]

On July 20, 2005, Plaintiff met with Julio, Zalitas, Bourque, and Kruse. [62] When the issue of travel arose, Julio stated she did not believe Plaintiff was ready for travel. [63] Zalitas explained that the position had "up to" seventy percent travel, but that the amount would fluctuate with the company's needs. [64] Plaintiff then raised his concerns about the return process. Zalitas acknowledged that the process reset the aging days and thus altered the return date, [65] and that he was aware of the need for technical improvement. [66] But since improvements would take more than a year to implement, Plaintiff would have

to be patient. [67] Plaintiff, Zalitas, and Julio also discussed additional training for Plaintiff. [68]

On July 21, 2005, Plaintiff met with Kruse and Robert McGrath ("McGrath"), a member of Staples Loss Prevention department. [69] McGrath agreed to investigate Plaintiff's allegations and asked Plaintiff to provide any additional information. [70] Plaintiff thereafter emailed McGrath about his concerns. [71] In his July 25, 2005 response, McGrath stated that he, Zalitas, and Greg Igo ("Igo"), Director of Project Management Office, had completed a thorough review of Plaintiff's allegations and had found no evidence of fraud or unethical behavior. [72]

Thereafter, Plaintiff underwent three to five hours of additional training on various aspects of his job. [73] Vicky Thomes ("Thomes") conducted the session on customer service and phone protocol. [74] When Julio inquired about the training, Thomes responded, "I hope he gets it. He was asking if he should read the logs to the customers? I told him I thought that would not be proper ... He just asks so many questions that have nothing to do with what we are working on at the time." [75]

**59.** Judith Gutierrez Email to Mary–Ellen Julio, dated July 18, 2005, Serafyn Aff. [# 44], Ex. O.

**60.** Pl.'s Statement at ¶¶ 178–183.

**61.** *Id.* at ¶¶ 193, 195.

**62.** *Id.* at ¶ 198.

**63.** Defendant's Statement of Undisputed Facts [# 42], ¶ 85 ("Def.'s Statement").

**64.** *Id.*

**65.** *Id.* at ¶ 87.

**66.** *Id.* at ¶ 88.

**67.** *Id.* at ¶ 88.

**68.** *Id.* at ¶ 89.

**69.** *Id.* at ¶ 90.

**70.** *Id.*

**71.** *Id.* at ¶ 91.

**72.** Robert McGrath Email to Kevin Day, dated July 25, 2005, Serafyn Aff. [# 44], Ex. Q.

**73.** Day DOL Test. at 278:23–25, 279:1–3.

**74.** Day DOL Test. at 261:5–6.

**75.** Vicki Thomes Email to Mary–Ellen Julio, dated July 27, 2005, Serafyn Aff. [# 44], Ex. R.

Plaintiff also had a training session with Bourque regarding Staples "team core values."[76] Plaintiff told Bourque that he had already been through this training before and described it as ineffective.[77] During this training, Plaintiff repeated his belief that Julio was either acting fraudulently or was incompetent.[78]

On August 3, 2005, Plaintiff had a meeting with Kruse, McGrath, Igo, and Steven Bussberg ("Bussberg"), the Vice President of Finance for North American Delivery.[79] During this meeting, Plaintiff reiterated his concerns about the credits and returns process.[80] Igo explained the impact of the credit and returns process on aging days and emphasized the completion rate, which is not affected by the cancellation date, as the more important metric.[81] Igo also informed Plaintiff told that senior management was fully aware of those policies.[82] Afterward, Igo felt that, in light of the numerous explanations Plaintiff had already received, he should have had a better sense and broader perspective on the process.[83] Based on Plaintiff's inflexibility and abrasiveness, Igo recommended Plaintiff's termination.[84] Kruse concurred.[85] Staples terminated Plaintiff on August 5, 2005, after eleven weeks of employment.[86]

Plaintiff filed a complaint with the U.S. Department of Labor's Occupational Safety and Health Administration ("OSHA") on September 26, 2005, alleging that Defendant terminated him in retaliation for his purported whistle blowing activity in violation of the Sarbanes–Oxley Act.[87] After examining the issues, the OSHA Investigator presented his findings in a letter dated November 23, 2005. He concluded that Plaintiff's allegations lacked merit and dismissed the complaint in Staples' favor.[88] Plaintiff filed timely objections to the findings and requested an administrative hearing, which took place on March 3 and March 6, 2006. On March 14, 2006, Plaintiff filed a Notice of Intent to File a Complaint in United States District Court. On April 11, 2006, Plaintiff filed the instant action.

III. DISCUSSION

Plaintiff advances one federal, and three state, claims against Staples: (1) Violation of 18 U.S.C. § 1514A—Sarbanes–Oxley Act of 2002; (2) breach of contract; (3) promissory estoppel; and (4) wrongful discharge in violation of a clearly established public policy. For the following reasons, this court ALLOWS Defendant's *Motion for Summary Judgment* [# 41] on all four counts and DENIES Plaintiff's *Motion for Partial Summary Judgment* [# 45] on the violation of Sarbanes–Oxley Act, breach of contract, and wrongful discharge claims.

A court may grant summary judgment only when the moving party has shown that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of

---

76. Def.'s Statement at ¶ 97.

77. Day Dep. II at 280:22–23.

78. Def.'s Statement at ¶ 98.

79. *Id.* at ¶ 99.

80. *Id.* at ¶ 101.

81. *Id.* at ¶¶ 100–1.

82. *Id.* at ¶ 102.

83. *Id.* at ¶ 107.

84. *Id.* at ¶ 108.

85. *Id.* at ¶ 109.

86. Pl.'s Statement at ¶ 314.

87. Compl. ¶ 75.

88. Findings Letter to Kevin Day from Department of Labor Occupational Safety and Health Administration, dated November 23, 2005, Serafyn Aff. [# 44], Ex. T.

law." [89] The court must examine the facts in the light most favorable to the non-moving party, and resolve any reasonable inference in that party's favor.[90] Here, both parties have moved for summary judgment. Since this court GRANTS Defendant's motion, the evidence is viewed in the light most favorable to Plaintiff.[91]

## A. Violation of 18 U.S.C. § 1514A, the Sarbanes–Oxley Act

 The Sarbanes–Oxley Act ("SOX") protects employees who report, or assist in the investigation of, conduct that violates federal laws or regulations "relating to fraud against shareholders." [92] To succeed on the claim that his termination violated SOX, Plaintiff must prove by a preponderance of the evidence that (1) he engaged in protected activity; (2) Defendant knew of the protected activity; (3) Plaintiff suffered an unfavorable employment action; and (4) circumstances exist to suggest that the protected activity contributed to the unfavorable action.[93] Here, Plaintiff's claim fails as a matter of law because Plaintiff did not engage in protected activities.

 SOX protects employees who "provide information ... regarding any conduct which the employee *reasonably believes* constitutes a violation of section 1341, 1343, 1344, or 1348, any rule or regulation of the Securities and Exchange Commission, or any provision of Federal law [to] ... a person with supervisory authority over the employee." [94] While there is no controlling case law on point, other federal district courts have interpreted the "reasonable belief" portion of the statute.[95] They have determined that a plaintiff need neither show an actual violation of law, nor cite a particular statute that he believed was violated.[96] Rather, Plaintiff must "state *particular concerns* which, at the very least, reasonably identify [Defendant's] conduct that [Plaintiff] believes to be illegal." [97] More specifically, the reasonableness of Plaintiff's belief "is to be determined on the basis of the knowledge available to a reasonable person in the circumstances with the employee's training and experience." [98]

Plaintiff articulated particular concerns about Staples' allegedly fraudulent return practices. In his July 15, 2005, letter to

---

**89.** Fed.R.Civ.P. 56(c).

**90.** *Dasey v. Anderson,* 304 F.3d 148, 153 (1st Cir.2002)

**91.** *See Alliance of Auto. Mfrs. v. Gwadosky,* 430 F.3d 30, 34 (1st Cir.2005) ("like the district court, we must scrutinize the record in the light most favorable to the summary judgment loser and draw all reasonable inferences therefrom to that party's behoof.").

**92.** 18 U.S.C. § 1514A(a)(1).

**93.** This framework was first articulated in *Collins v. Beazer Homes USA, Inc.,* 334 F.Supp.2d 1365, 1375 (N.D.Ga.2004). It has been adopted by numerous federal courts. *See, e.g., Mozingo v. South Fin. Group, Inc.,* 520 F.Supp.2d 733 (D.S.C.2007); *Fraser v. Fiduciary Trust Co. Int'l,* 417 F.Supp.2d 310, 322 (S.D.N.Y.2006). *See also* 29 C.F.R. § 1980.104(b).

**94.** 18 U.S.C. § 1514A (a)(1) (emphasis added).

**95.** *See, e.g., Mahony v. Keyspan Corp.,* 2007 WL 805813, **5–6, 2007 U.S. Dist. LEXIS 22042, at *14–15 (E.D.N.Y. Mar. 12, 2007); *Smith v. Corning, Inc.,* 496 F.Supp.2d 244, 248 (W.D.N.Y.2007); *Collins,* 334 F.Supp.2d at 1375.

**96.** *Mahony,* 2007 WL 805813, **4–5, 2007 U.S. Dist. LEXIS 22042, at *14; *Collins v. Beazer Homes USA, Inc.,* 334 F.Supp.2d 1365, 1375 (N.D.Ga.2004).

**97.** *Fraser,* 417 F.Supp.2d 310, 322, *citing Lerbs v. Buca Di Beppo, Inc.,* 2004–SOX–8, 2004 DOLSOX 65, at *33–34 (emphasis in original).

**98.** *Mahony,* 2007 WL 805813, **5–6, 2007 U.S. Dist. LEXIS 22042, at *15.

Human Resources, Plaintiff described the process of cancelling and reissuing returns as "intentionally and selfishly defrauding the shareholders of this company of their return on investment so that Mary–Ellen [Julio] can herself look good for her supervisors."[99] Plaintiff alleged that these methods amounted to "accounting fraud and general unethical behavior."[100]

Though his concerns were stated with adequate particularity, Plaintiff's *belief* that he had uncovered fraud was not reasonable. To make this determination, this court must examine Day's knowledge in light of his training and experience.[101] In so doing, this court is guided by the decisions of other federal district courts.

In the first case, a plaintiff with ten years of work experience heard from his company's Director of Accounting Research ("DAR") that the company had not properly reported to the public, among other things, a former CEO's severance package.[102] Though plaintiff had taken only a few nonprofessional courses in accounting, he had sufficient knowledge to realize that the activities the DAR had "pointed out were in violation of General Accepted Accounting Principles."[103] Moreover, since the DAR was in charge of financial reporting, it was reasonable for plaintiff to "trust[ ] [the DAR's] judgment and expertise."[104] In sum, plaintiff had sufficient work experience and training to ground a reasonable belief that fraud was taking place.

In a second case, plaintiff worked for four years as a Senior Financial Analyst before being promoted to a managerial position.[105] In his new role as a manager, he was responsible for monitoring the company's compliance with General Accepted Accounting Principles ("GAAP") for its "Global Portfolio financial system and financial process duties," and assisting in the preparation of reports to the Securities and Exchange Commission.[106] Plaintiff alleged that the company had implemented a financial reporting program that did not comply with GAAP; this in turn generated incorrect quarterly reports that could have misled investors.[107] The court determined that plaintiff's belief that he had uncovered fraud was reasonable in light of his background and scope of work.[108]

■ In this case, however, Day lacks the knowledge, training and experience to harbor a reasonable belief of fraud. Day graduated from college on May 22, 2005. He began his job at Staples the very next day. Unlike the abovementioned plaintiffs, who had years of work experience in the financial sector and held positions closely related to finance, Day had little relevant work experience. Nor did he have training, professional or otherwise, in accounting or financial services. His theorization of a link between return policies and shareholder fraud was creative at best, and precipitate in the extreme. Day worked at an entry-level position in the returns department for *seven* weeks, two

99. Day Letter.

100. *Id.*

101. *Mahony*, 2007 WL 805813, **4–5, 2007 U.S. Dist. LEXIS 22042, at *14.

102. *Id.*, 2007 WL 805813, *1, 2007 U.S. Dist. LEXIS 22042 at *2.

103. *Id.*, 2007 WL 805813, *1, 2007 U.S. Dist. LEXIS 22042 at *3.

104. *Id.*

105. *See Smith*, 496 F.Supp.2d at 245.

106. *Id.*

107. *See id.* at 248–249.

108. *See id.* at 250.

of which were spent training in California, before airing his theory.

Moreover, Day's superiors repeatedly explained the returns process:

- On July 14, 2005, the day before Plaintiff drafted his letter to the Human Resources Department, Julio explained to Day why Staples canceled and reissued the returns.[109]

- During the July 18, 2005 meeting with human resources personnel, Plaintiff again voiced his concerns about fraud. While the human resources personnel disagreed with his assessment, they agreed to investigate Plaintiff's claims.[110]

- At the July 20, 2005 meeting, Zalitas informed Plaintiff that he was aware that the outstanding returns were low, but in the absence of a more efficient system, Staples would continue to use the current system.[111]

- In an email response, Vice–President Bob McGrath notified Plaintiff on July 25, 2005:

 After a thorough review, I don't find any evidence of fraud or unethical behavior. As an example, senior management is aware the returns goals is being impacted by the process of canceling and reissuing. The process . . . is being followed . . . in the absence of a more efficient method. . . . I understand your frustration, however would encourage you to be patient and focus on your job function.[112]

- Likewise, at the August 3 meeting between Plaintiff and senior management, Greg Igo again explained to Plaintiff the reasons for Staples' return procedures.[113]

Plaintiff's lack of experience in the industry and ignorance of financial metrics, coupled with Staples' repeated (and valid) explanations, show that Plaintiff did not harbor a *reasonable* belief that Staples was perpetrating fraud against its shareholders. Even if Plaintiff's claims had been reasonable at the outset, and they were not, they ceased to be reasonable after Staples' employees reiterated the rationales for the returns process, and assured Plaintiff that no fraud was being committed.

## B. Breach of Contract

■ Plaintiff next alleges that Staples' Code of Ethics ("Code") formed part of his employment contract, and that Staples violated its own Code by discharging him for a retaliatory purpose. Plaintiff is correct that a personnel manual *may* form part of an employment contract.[114] But he has not shown that Defendant terminated him for a retaliatory purpose. Thus, the breach of contract claim must also fail.

■ Even if the Code formed part of the employment contract, Staples did not violate the Code's provisions. Plaintiff alleges that Staples breached the obligations of its Code by terminating him in a retaliatory fashion. As is clear from the above recitation of facts, however, Staples did not terminate Plaintiff for reporting his concerns of fraud. Indeed, Staples took Plaintiff's allegations very seriously, and undertook the appropriate investigations. The subsequent decision to terminate Day derived from his poor performance and

---

109. Def.'s Statement at ¶ 58.

110. *Id.* at ¶ 83.

111. *Id.* ¶¶ 87–88.

112. *Id.* ¶ 93.

113. *Id.* ¶ 100.

114. *O'Brien v. New England Tel. & Tel. Co.*, 422 Mass. 686, 664 N.E.2d 843, 847 (1996); *Jackson v. Action for Boston Cmty. Dev., Inc.*, 403 Mass. 8, 525 N.E.2d 411, 414 (1988).

abrasive attitude, as documented voluminously by employees such as Julio, Watanabe, Igo, Gutierrez and Thomes. Moreover, as an at will employee still in his probationary period, Plaintiff was under scrutiny; he should have behaved accordingly. As a recent college graduate with little professional experience, Day's authority to tell his superiors how to run a large corporation was presumptuous, to say the least. He cannot cover his poor performance by claiming wrongful retaliation.

### C. Promissory Estoppel

Plaintiff also claims that Staples promised his job would consist of 70 percent travel. Based on this representation, Day allegedly elected to live with his parents, ninety-five miles away, and commute to the office. Plaintiff did not travel 70 percent of the time he was employed at Staples, and thereby articulates a promissory estoppel claim against Staples.

■ In Massachusetts, promissory estoppel permits recovery when (1) a promisor makes a promise which he should reasonably expect to induce reliance by the promisee; (2) the promise induces such reliance; and (3) injustice can be avoided only by enforcing the promise.[115] The party invoking promissory estoppel must show that he *"reasonably* relied on the alleged promise to his detriment,"[116] and that there was "an unambiguous promise."[117]

■ Plaintiff alleges that he was promised that the position would require 70 percent travel. This information was conveyed to Plaintiff orally during an initial telephone call with a Staples recruiter, and later during an interview with Julio.[118] Significantly, his employment contract mentions nothing about travel. Nor does Day offer any proof that Staples made an "unambiguous promise" that he would travel 70 percent of the time. This court finds, therefore, that it was not *reasonable* for him to rely on these representations. And even if it were, there is simply no way Staples could rationally expect a full-time employee to live 95 miles from the office, based on expectations that he would traveling frequently.

It is important to note that Plaintiff did, in fact, travel during his employment. His training in California brought Plaintiff to the West Coast for two weeks. The reason Plaintiff did not travel more frequently, as Defendant points out, resulted from Staples' specific concerns that Plaintiff was ill-prepared to travel. During his trip to California, for instance, Plaintiff alienated his trainer and, upon returning, told Julio the trip was a waste of time. Staples should not be expected to send such a person to represent the company.

### D. Wrongful Termination

■ Lastly, Plaintiff claims that Staples terminated him in violation of a clearly established public policy. Specifically, Plaintiff theorizes that "a federal whistleblowing statute [such as SOX] can provide the basis for the public policy exception to make a claim of wrongful termination under Massachusetts law."[119] Indeed it might. But since the above analysis al-

---

**115.** *Hinchey v. NYNEX Corp.,* 144 F.3d 134, 143 (1st Cir.1998).

**116.** *Coll v. PB Diagnostic Sys., Inc.,* 50 F.3d 1115, 1124 (1st Cir.1995) (*quoting Hall v. Horizon House Microwave,* 24 Mass.App.Ct. 84, 93, 506 N.E.2d 178 (1987))(emphasis in original).

**117.** *Upton v. JWP Businessland,* 425 Mass. 756, 682 N.E.2d 1357, 1360 (1997).

**118.** *See* Pl.'s Statement at ¶¶ 4, 9.

**119.** Mem. in Support of Pl.'s Mot. for Summ. J. [# 46] 11.

ready shows that Staples did not run afoul of SOX, this court need not address the novel legal issue of whether SOX provides a public policy exception to the at-will employment doctrine.

## IV. CONCLUSION

For reasons stated above, Defendant's *Motion for Summary Judgment* is ALLOWED as to all four claims and Plaintiff's *Motion for Partial Summary Judgment* is DENIED.

IT IS SO ORDERED.