# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued May 12, 2008           Decided June 27, 2008

No. 07-7137

MEDIA GENERAL, INC., A VIRGINIA CORPORATION,
APPELLANT

v.

DONALD R. TOMLIN, JR., INDIVIDUALLY AND AS TRUSTEE OF
THE TOMLIN FAMILY TRUST, ET AL.,
APPELLEES

Consolidated with 08-7006

Appeals from the United States District Court
for the District of Columbia
(No. 98cv01690)

*David E. Mills* argued the cause for appellant. With him on
the briefs were *Michael D. Rothberg* and *Lynn M. Deavers*.

*Catherine E. Stetson* argued the cause for appellee. With
her on the brief were *George H. Mernick III*, *Richard A. Getty*,
*Suart F. Delery*, *William B. Mallin*, *Edward J. Longosz II*, and
*Mark A. Johnston*. *John R. Kenrick* entered an appearance.

Before: GINSBURG, BROWN and GRIFFITH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* GINSBURG.

GINSBURG, *Circuit Judge*: Media General bought Park Communications for $710 million in 1996 without knowing that one of Park's recently departed vice presidents, Richard Prusator, had threatened to sue Park, seeking $6 million for wrongful discharge. After settling with Prusator and incurring substantial attorney's fees, Media General sued several persons associated with Park for securities fraud, alleging they had made material misrepresentations and omissions concerning the threat of litigation. The district court granted summary judgment to the defendants. We affirm in part and reverse in part.

## I. Background[*]

In 1996 Donald Tomlin and Gary Knapp approached Media General and asked whether it would be interested in purchasing their company, Park Communications. In July of that year, the two companies executed a merger agreement in which Media General agreed to pay $710 million for Park.

Because the transaction was subject to approval by the Federal Communications Commission, the sellers would continue to manage Park for a considerable time before the closing could take place. The agreement therefore provided that the purchase price could be adjusted to reflect certain events occurring prior to the closing. Park also represented "[t]here is no suit ... to the knowledge of the Company[] threatened against or affecting the Company ... that ... is reasonably expected to have a Company Material Adverse Effect" and promised this representation would be "true ... as of the [closing date] as if made at and as of [that] time." Media General was given the right to terminate the merger agreement if Park did not fulfill

---

[*]Except as noted, the facts are undisputed.

this promise. In addition, Marshall Morton, the Chief Financial Officer of Media General, asserts that $10 million of the $710 million price Media General agreed to pay was in exchange for Park's promise of "straightforward behavior" until the closing took place. That alleged understanding was not, however, reduced to writing.

Also in July 1996, Park fired Prusator, one of its vice presidents. Two months later, Prusator's lawyer wrote to Park, threatening to sue if he did not receive a $139,000 severance payment. Prusator also informed Media General that his lawyer was attempting to recover the severance payment, stating Media General "should be aware of" this issue "in case the matter [is] ... not settled by the time of the closing." Park then threatened to sue Prusator for tortious interference with contract if he ever contacted Media General again. Prusator sent no further communications to Media General but he did increase the pressure on Park. He sent Park a draft complaint alleging wrongful termination, a RICO violation, and securities fraud. He suggested damages might be as high as $6 million but expressed his willingness to settle the matter for $3 million.

Park did not inform Media General of this threatened lawsuit. Three representatives of Media General -- the Comptroller, the Chief Financial Officer, and outside counsel -- say they inquired about Prusator's claim during the months between the execution of the merger agreement and the closing, and were assured by both Wright Thomas, Park's president, and Stephen Burr, Park's outside counsel, that Prusator sought only $139,000. In December 1996, however, Park sent a letter to its auditor describing the threatened lawsuit in detail and characterizing it as a "material loss contingency." The auditor, who agreed with that assessment, prepared a draft audit in which he noted in the margin that "legal counsel to [Park] has not been able to form an opinion on the merits of [Prusator's] claims." Although Media General was aware of the pending audit, Media

General did not ask to see the draft audit or any correspondence between Park and the auditor.

In January 1997 the parties attended pre-closing meetings to address certain unresolved issues. Four representatives of Media General testified that they inquired again at the meetings about Prusator but were not told of his claim for $6 million. During the closing negotiations, Park agreed to decrease the purchase price by $147,000, comprising $139,000 for Prusator's claim for severance pay plus an allowance for fees and expenses.

The day after the closing, Media General received from Park a copy of the draft audit, from which it first learned of Prusator's $6 million claim. Leonard Baxt, Media General's outside counsel, called Burr, Park's outside counsel, and expressed "great disappointment" at not having been told about this litigation prior to the closing. Shortly thereafter, Burr told the auditor that Prusator's chance of succeeding on his $6 million claim was "remote," as a result of which the auditor deleted from the draft audit the footnote regarding the Prusator litigation. Two weeks after the closing, when Media General filed Form 8-K with the Securities and Exchange Commission, in which it was required to disclose any contingencies material to Park's financial condition, it did not mention the Prusator litigation.

Prusator followed through on his threat to sue. After nine of the ten counts in his complaint had survived a motion to dismiss, Media General settled with him for more than $200,000 -- the $139,000 he had asked for initially plus his attorney's fees. Media General claims it incurred $241,541.51 in attorney's fees of its own.

In 1998 Media General sued Tomlin and Knapp, Park's two former shareholders, as well as Thomas, Burr, and Burr's law

firm, alleging both securities and common law fraud, based upon their failure to disclose Prusator's threatened claim for $6 million prior to the closing. The district court granted the defendants' motion for summary judgment. It held the Prusator litigation was not "material" to the merger because Media General did not characterize it as such in its SEC filing.

This court reversed, concluding a reasonable jury could find the Prusator litigation was "material." 387 F.3d 865, 870 (2004). We rejected the district court's reliance upon Media General's SEC filing, noting that Media General filed that document only after the merger had closed. *Id.* at 870-71. The relevant time for determining whether a fact was material to the merger was at the moment before the closing. *Id.* at 871.

We also rejected the defendants' contention the lawsuit was not material because Media General was bound by the merger agreement and therefore could not have walked away from the deal even if it had known about Prusator's lawsuit. Under that agreement, Media General could have withdrawn if the lawsuit constituted a "Company Material Adverse Effect." *Id.* at 871-72. Even if the lawsuit was not such an "Effect," Media General could have sought greater concessions "had it known of Prusator's expanded claims at closing"; as it was, it received a $147,000 reduction in the purchase price. *Id.* at 872.

On remand, the district court again held the defendants were entitled to summary judgment on Media General's claims of fraud. 505 F. Supp. 2d 51 (2007). It regarded the testimony of the Media General representatives as too vague to support the inference that Park's omissions were misleading, *id.* at 62, and considered Media General's reliance upon Park's purported misrepresentations unreasonable because Media General could have asked Park for the correspondence between Park and its auditors. *Id.* at 63-66.

The district court also rejected Media General's claim for $10 million in damages in addition to the costs it incurred in the Prusator litigation. Media General argued the purchase price of $710 million included $10 million it had agreed to pay specifically in exchange for Park's assurance of straightforward dealing; therefore, had it known at closing that Park had failed to disclose the lawsuit, Media General would have demanded an extra $10 million concession. The district court found this theory too speculative to survive summary judgment. *Id.* at 61.

## II. Analysis

Media General now appeals for the second time. As before, we review the district court's grant of summary judgment de novo. *Curtin v. United Airlines, Inc.*, 275 F.3d 88, 93 (D.C. Cir. 2001).

### A. The claims of fraud

Media General contends the district court erred in entering judgment for Park on its claims of securities fraud under SEC Rule 10b-5 and common-law fraud under District of Columbia law. Under Rule 10b-5, it is unlawful to make "any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading ... in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5; *see also* 15 U.S.C. § 78j(b). To prevail in an action brought under Rule 10b-5, the plaintiff must demonstrate that (1) the misrepresentation or misleading omission was made with an "intent to deceive, manipulate, or defraud," *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 (1976); (2) he reasonably relied upon it, *see Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276-77 (D.C. Cir. 1994); and (3) he suffered an economic loss as a result, 15 U.S.C. § 78u-4(b)(4). The elements of common law fraud are similar: The

plaintiff must show that the defendant, with the intent to induce reliance, knowingly misrepresented or omitted a material fact upon which the plaintiff reasonably relied to his detriment. *See, e.g.*, *Schiff v. Am. Ass'n of Retired Persons*, 697 A.2d 1193, 1198 (D.C. 1997); *One-O-One Enters. v. Caruso*, 848 F.2d 1283, 1286 (D.C. Cir. 1988).

It is beyond cavil that a reasonable jury could find representatives of Park made both misleading omissions and untrue statements.  Four representatives of Media General testified that they inquired about the Prusator matter repeatedly, both before and during the meetings leading up to the closing, and that the Park representatives, in response, consistently adverted only to Prusator's $139,000 claim, never mentioning his $6 million claim.  Those were misleading omissions. *See Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002) (omission misleading if it "affirmatively create[s] an impression of a state of affairs that differs ... from the one that actually exists").  Further, Dickinson testified that a Media General representative asked "specific questions" during the closing meeting and was assured the lawsuit was for "no more than $139,000," which was an affirmative misrepresentation.

The district court, however, held Media General's reliance upon these alleged omissions and misrepresentations was unreasonable because it did not ask to see Park's letters to its auditor, which described the threatened litigation fully.  We do not agree.

First, several representatives of Media General testified that they asked Burr and Thomas about the Prusator litigation, and were told only about the $139,000 and not about the $6 million claim.  If so, then Media General was not obliged to ask for Park's letters to its auditor in order to determine whether the Park people were lying. *See Astor Chauffeured Limousine Co. v. Runnfeldt Inv. Corp.*, 910 F.2d 1540, 1546 (7th Cir. 1990)

("Securities laws are designed ... to compel the person who knows firm-specific information to reveal it ....  To say that a deceived buyer may not recover unless it has tried to verify the seller's statements would prevent the achievement of this objective").

Second, Park was contractually obliged to disclose any material litigation threatened prior to the closing -- and this court has already concluded a reasonable jury could find the Prusator matter was material.  387 F.3d at 871-72.  Absent any evidence to the contrary (of which more in the next paragraph) it was reasonable for Media General to assume Park was not breaching an express term of their contract.

Third, Park acted affirmatively to conceal the expanded Prusator claims from Media General.  When Prusator informed Media General he would sue for $139,000, Park threatened to sue Prusator if he sent any more correspondence to Media General.  Media General could reasonably rely upon Park not only to honor its contractual duty to disclose any threatened lawsuit but, even more certainly, not to hinder Media General from learning about a lawsuit.  *Banca Cremi, S.A. v. Alex. Brown & Sons, Inc.*, 132 F.3d 1017, 1028 (4th Cir. 1997) (noting that reliance may be reasonable when the defendant "conceal[ed] ... the fraud").

The district court also concluded "[t]here is no showing that defendants knew" Media General was unaware of the expanded claims, 505 F. Supp. 2d at 64, but the record is to the contrary.  When the defendants were made aware Prusator had alerted Media General to his claim for $139,000, they threatened to sue him if he sent Media General any further correspondence; Park obviously tried to ensure that Media General remained unaware of any further developments in the Prusator litigation.  Park got some confirmation at the negotiations prior to the closing that its plan had worked; Media General demanded a reduction in price

to offset only the $139,000 claim. Park's representatives could readily infer that Media General was unaware of any greater claim. Their actual state of mind is a question for the jury.

In sum, a reasonable jury could find Park made misleading omissions and misrepresentations upon which Media General reasonably relied and which, as we have previously explained, prevented Media General from seeking "substantially greater concessions" at the closing negotiations. 387 F.3d at 872. Media General is, therefore, entitled to a trial on both its 10b-5 and its common law claims.

B. Damages

Having concluded a reasonable jury could find the defendants committed fraud, we now consider what damages theories Media General may raise before the jury. Media General asserts it incurred damages in two ways. First, it contends that if it had known about the Prusator litigation at the closing negotiations, then it could have obtained complete indemnification for the cost of litigating those claims; therefore, it is entitled to recover the settlement paid to Prusator and the attorney's fees it incurred litigating the case. The defendants do not contest that this is a plausible theory of damages.

Media General also argues it is entitled $10 million in damages above and beyond the cost of litigating Prusator's lawsuit, which argument the district court rejected as speculative. Media General asserts that in negotiating the merger agreement, it agreed to raise its purchase price from $700 million to $710 million in return for Park's oral agreement to "act in good faith." Media General does not claim Park is

liable for breaching this purported oral agreement.[*]   Rather, Media General's theory is that if Park had apprised it of Prusator's $6 million claim before the closing, then it would have threatened to withdraw from the deal unless Park not only indemnified it for the costs of the Prusator litigation but also sweetened the pot with a $10 million price reduction, corresponding to their alleged $10 million oral agreement. Media General contends that because Park's market value had declined by $100 million between the signing of the merger agreement and the closing, the sellers would have agreed readily to a $10 million price reduction in order to preserve a $90 million premium over the market value.

Media General's theory is implausible.  If it had threatened to withdraw from the merger agreement because of the Prusator litigation, then Park could simply have offered to indemnify Media General for any costs associated with that lawsuit. Indeed, a Media General official conceded that if Park had provided full indemnification for the expanded Prusator claims, those claims would not otherwise have altered the transaction. Media General could no longer have walked away from the deal because the litigation would no longer have been materially adverse to Media General's interests.  There is no reason to believe Park would have reduced the purchase price based upon a $10 million oral agreement the very existence of which the parties had denied in their written agreement.

III. Conclusion

---

[*]With good reason:  The merger agreement not only makes no mention of the oral agreement for $10 million; it provides there "are no other representations or warranties ... between the parties ... except as expressly set forth herein."

The judgment of the district court is affirmed with respect to the claim for $10 million in damages. The judgment is reversed with respect to the fraud claims, which are remanded for further proceedings consistent with this opinion.

*So ordered.*