# United States Court of Appeals
## For the First Circuit

No. 08-1689

KEVIN M. DAY,

Plaintiff, Appellant,

v.

STAPLES, INC.,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Joseph L. Tauro, U.S. District Judge]

Before

Lynch, Chief Judge,
Howard, Circuit Judge,
and Garcia-Gregory,[*] District Judge.

Bryan J. Day for appellant.
Dawn Reddy Solowey with whom Ariel D. Cudkowicz, Krista Green
Pratt, and Seyfarth Shaw LLP were on brief for appellee.

February 9, 2009

---

[*]    Of the District of Puerto Rico, sitting by designation.

**LYNCH**, **Chief Judge**.  This is our first occasion to interpret the requirements for an action under the whistleblower protection provision of the Sarbanes-Oxley Act ("SOX"), 18 U.S.C. § 1514A.  Kevin Day sued his former employer, Staples, Inc., alleging he was fired for reporting fraud, in violation of this federal whistleblower protection provision and of state law.  SOX prohibits discharging an employee because the employee provides information to a supervisor "regarding any conduct which the employee reasonably believes constitutes a violation of [several enumerated laws] . . . or any provision of Federal law relating to fraud against shareholders."  Id.

Day's complaint did not assert any specific violations of securities laws; rather, it stated that he believed certain Staples practices resulted in the "manipulat[ion] [of] accounting data in an unlawful manner that had negative financial ramifications for Staples," which "defrauded Staples' shareholders" and violated the Staples Code of Ethics.  The district court granted summary judgment in favor of Staples.  Day v. Staples, Inc., 573 F. Supp. 2d 336 (D. Mass. 2008).  We establish the criteria by which such claims are to be evaluated and affirm.

I.

On an appeal from a grant of summary judgment, we take all reasonable inferences in favor of the plaintiff, as the nonmoving party.  Mellen v. Trs. of Boston Univ., 504 F.3d 21, 24 (1st Cir.

2007).  We may nonetheless ignore "conclusory allegations, improbable inferences, and unsupported speculation."  Prescott v. Higgins, 538 F.3d 32, 39 (1st Cir. 2008) (quoting Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990)).

We tell the material facts, which are undisputed, not in entirely chronological order, but as parallel accounts of Day's complaints to Staples and of Staples's growing dissatisfaction with Day's work.  Day worked for Staples for less than three months, from May 23, 2005 to August 5, 2005, never progressing from his entry level Analyst position in Staples's Reverse Logistics Department.  During his employment, he offered many criticisms of Staples business practices.  The nature of those criticisms is at the heart of this case.

Day was offered a position as a Reverse Logistics Analyst on May 6, 2005, shortly before his graduation from the University of Massachusetts-Amherst, in a letter which stated that Day would have to sign Staples's Code of Ethics on his first day of work as a condition of employment.

The Reverse Logistics Department analyzes open product returns and coordinates product returns from customers who order Staples products in large volume and also return products in bulk.  Such product returns involve two separate departments.  Reverse Logistics handles the actual delivery of returned products to the

warehouse; by contrast, it is Staples's Customer Service Department which normally issues monetary credits to the customer.

Day's duties included analyzing open customer returns for assigned warehouse locations and addressing issues with couriers who picked up returned products. Although Day was initially told in his interview that his job responsibilities would include up to 70 percent travel in order to work with midwest regional returns, Day's actual duties did not involve travel, other than for his initial training. Mary-Ellen Julio, the Manager of the Reverse Logistics Department, supervised Day's work. She became the subject of several of his complaints.

A.      Day's Complaints of Alleged Shareholder Fraud

Day soon came to believe that certain Staples business practices he observed in Reverse Logistics were potentially unlawful and unethical. He ultimately complained to his supervisors about three types of practices, which we summarize and then return to in some detail. First, he claimed to his employer that Reverse Logistics issued monetary credits to customers without having received proper documentation;[1] this, in his view, raised the risk of Staples overpaying credits to customers who did not return goods.

----

[1]      Day was told that Staples policy mandated that before issuing a credit to a customer, Staples required two pieces of supporting documentation: a return authorization form indicating the item had been picked up from a customer and a pallet manifest showing the item was on the pallet on its way back to Staples's warehouse.

Second, he alleged that Reverse Logistics knowingly withheld money from contract customers by under-issuing credits over $25.00; this, in his view, raised the risk to Staples of inaccurately accounting by overstating Staples revenues and to customers of not getting full refunds. Third, he claimed that Reverse Logistics's practice of canceling and reissuing pick-up orders could permit couriers to overbill Staples. This, in his view, raised the risk of a reduction in Staples's profits.

Two of the alleged harms were ostensibly against Staples's corporate self-interest: the possible overpayment of refunds to customers who returned goods and the possible overpayment of couriers. Day argued, however, that the canceling and reissuing practice benefitted Staples managers because it resulted in the manipulation of an internal metric called "aging days," the time interval between Staples's receipt of a customer request for a pickup of a product for return and when a Staples courier actually picked up the product. Day believed that his supervisor Julio's bonus was tied to the average aging day metric, and that it was in her interest to make that number seem artificially low. Day was incorrect and his belief was based on a conversation with a co-worker named Jason Englemeyer. Day never actually saw a bonus policy and was never told about the bonus calculation by Julio, whose bonus was never tied to the aging days metric.

Day communicated his concerns about these three practices to Julio and other supervisors in a series of face-to-face meetings and email exchanges. Day first articulated his concerns on July 14, 2005. That day, he met with Julio at her request; to Julio's dismay, Day had recommended a competitor company's product to a dissatisfied customer over the phone. During the meeting, Day communicated one of his three key allegations: he told Julio that he believed the company was inappropriately canceling and reissuing return orders and this permitted her to manipulate the company's measurement of aging days so that Julio would "look good for her bosses." Day stated that if the information about the alleged accounting manipulation "ever went to Wall Street[,] heads would turn." Julio explained the business reasons for canceling and reissuing return orders, including that the couriers in the locations that Day handled did not have the ability to reprint the previous orders or obtain Staples's paperwork in any other way than canceling and reissuing. Julio felt that Day refused to accept the explanations.

One hour after that July 14 meeting, Julio met with Anne-Marie Bourque, the Staples human resources representative for Reverse Logistics. Julio expressed her concerns about Day's behavior and recommended that Day's employment be terminated because of his poor performance, including Day's recommendation of a competitor's product to a customer. At Bourque's suggestion, Julio

-6-

documented Day's performance issues in a memo. The memo also included reports of conflicts with co-workers and unprofessional behavior and recommended termination.

The next day, July 15, 2005, Day delivered a letter to Doreen Nichols, Director of Associate Relations and Diversity in Staples's Human Resources Department, which repeated the allegations he had made the previous day about the cancellation and reissuance policies. His letter contained a section entitled "Forced Participation in Fraudulent Activity." In his letter, Day complained that: (1) he felt he was "being pressured into knowingly committing fraud so that [his] supervisor Mary-Ellen Julio can report false and inaccurate numbers"; (2) while he knew Julio was not happy with his job performance, he "refuse[d] to knowingly take part in the mass canceling and reissuing of pickup orders just for the sake of resetting aging days," a practice he described as "defrauding the shareholders of this company of their return on investment so that [Julio] can make herself look good for her supervisors"; and (3) "any auditor" could "find hundreds, if not thousands, of cases of inaccurate reporting of figures, accounting fraud and general unethical behavior," much of it defrauding customers. He stated that the "fraudulent activity . . . needs to stop immediately." The letter also contained a section in which Day alleged there were misrepresentations in his job description, stating that he had not traveled as much as had been promised.

Nichols met with Day on July 15 for one hour so that Nichols could get a clear understanding of Day's concerns. She assured Day his concerns would be forwarded to the appropriate personnel. Nichols forwarded Day's letter to Ellen Kruse, Staples's Regional Director of Human Resources, and Nan Stout, Staples's Vice President of Ethics. Stout did not contact Day directly, but instead asked Robert McGrath, Staples's Director of Loss Prevention, to investigate the allegations in the letter.

Three days later, on July 18, 2005, Day met with Bourque and Kruse to discuss the July 15 letter. At the meeting, Kruse told Day that the allegations in the letter were very serious, and she requested more specific examples of the type of accounting fraud and unethical behavior that Day had alleged in his July 15 letter. Day then identified the three practices that now form the basis of his claim for § 1514A protection: the canceling and reissuing of returns, the withholding of credits from contract customers, and the issuance of credits without proper documentation. Kruse told Day she thought he was wrong about his allegations; still, Bourque and Kruse told Day that they would investigate his allegations. Indeed, McGrath had already been asked to look into the allegations.

On July 20 and 21, 2005, Staples brought in Reverse Logistics senior managers to address Day's allegations with him. On July 20, George Zalitis, Director of Staples's Office of Project Management, Julio, Kruse, and Bourque met with Day. Zalitis oversaw

all of Reverse Logistics, including Julio's team. Day complained he was not traveling more and said the Reverse Logistics Analyst job did not require analytic skills; it could be done by a high school student. In the discussion of whether the returns process was improper, Day's supervisors stated that there were business reasons for the practices. For example, Zalitis explained that canceling and reissuing returns was necessary for efficient delivery of paperwork to couriers: sometimes a courier who was scheduled to pick up a return either lost or misplaced paperwork and therefore did not pick up the return. Reverse Logistics had determined that the most efficient way to get that paperwork back to the courier was simply to cancel and reissue the return rather than to fax the paperwork to the courier, as Day preferred to do. Further, Zalitis explained that the critical metric he used was the completion rate of deliveries rather than aging days and that any technical improvements in the system were not worth it: they would be expensive and time-consuming to implement. In the July 20 meeting, Day was instructed to perform his job as directed while the company investigated his July 15 allegations and to undergo additional training.

In a third meeting on July 21, 2005, Day discussed his concerns with Kruse and McGrath, who had been assigned to investigate Day's complaints. McGrath assured Day that his allegations would be investigated and invited him to submit further

information about his concerns.  That day, McGrath met with Zalitis and Greg Igo, the Director of Planning, who had previously helped create the Reverse Logistics Department.  Igo and Zalitis explained the business purposes behind the credit and returns processes to McGrath, so that McGrath would understand the entire returns process in assessing Day's complaints.

On July 23, 2005, Day sent a follow-up email to McGrath elaborating on the situations in which the alleged unethical and fraudulent activity in Reverse Logistics were occurring and urging McGrath to examine those specific examples. In particular, Day expressed concern with Staples's practice regarding the issuance of credits to contract customers and of requiring that contract customers call before Reverse Logistics would issue a credit.

On July 25, McGrath emailed Day to report that, having conducted his investigation, he had found no evidence of fraud or unethical behavior.  McGrath stated that he had followed up with Zalitis and Igo to discuss Day's allegations.  McGrath wrote that "management is aware the returns goal is being impacted by the process of cancelling/reissuing.  The process . . . is being followed to communicate with couriers and fleet locations in the absence of a more efficient method."  McGrath also indicated that he would share the concerns Day raised in his July 23 email with Zalitis.

Day felt, however, that his concerns were not being taken seriously, due to the short duration of McGrath's investigation and the brevity of his email. Day contends McGrath's investigation consisted only of the July 21 meeting with Day, the July 21 meeting with Zalitis and Igo, and Day's follow-up email on July 23, and that this was insufficient to address his allegations.

Staples then brought in even more senior management to meet with Day on August 3. Day repeated his allegations in a meeting with Steve Bussberg, Vice President of Finance for North American Delivery, Igo, McGrath, and Kruse. Bussberg is the most senior Staples official who met with Day. Igo again explained that senior management had made a considered judgment to implement the practice of canceling and reissuing orders about which Day complained, and that this method was preferable because it allowed Staples to re-drop the paperwork for outstanding orders. He also explained why Day's proposed alternative practice -- reprinting and faxing the orders -- would be less efficient.

At the August 3, 2005 meeting, Igo also explained the reasons for the process of issuing credits to contract customers. Staples's business practice is to offer "hassle-free" returns to the customer, which allows contract customers to return a product with any subsequent order and have the credit applied to that subsequent order. Logistical difficulties in the past had led to Staples often issuing duplicate credits, because both Customer Service, which

addressed customer concerns, and Reverse Logistics, which coordinated the physical returns, would credit the customer. Igo explained that Staples's approach avoided such double crediting. Staples had studied the issue in 2005, weighing the costs and benefits of issuing duplicate credits compared to giving immediate credits to the customer, and determined that the best practice was for the Reverse Logistics Department to enter a "log note" in the system, because the Customer Service Department had likely already issued a credit.

Day, however, insisted his methods were preferable to those the company had adopted after consideration. Igo believed that because the August 3 meeting was at least the fourth meeting Day had had with upper management, Day should have had a broader perspective on the Reverse Logistics processes, but that Day did not.

After his August 3, 2005 meeting with Day, Igo recommended termination of Day's employment. Igo based his recommendation on his own experience with Day's inflexibility and the prior complaints from Day's direct supervisors that Day was not performing his job well and threatened not to follow his managers' instructions. Long before this meeting, Julio had complained to Igo about Day's unsatisfactory performance in July and August. Joanie Cordani, another Staples manager, had also told Igo that Day was abrasive. Kruse and Bussberg agreed with Igo's recommendation.

On August 4, Day emailed Kruse with further concerns about his job and affirmed his concerns with crediting procedures. He requested that the issue be discussed the following day.

Staples terminated Day's employment on August 5, during a meeting that Day had requested to address his concerns further. That day, the plaintiff had an exit interview with McGrath and Kruse. At the meeting, McGrath told Day that he was "looking for perfection in an imperfect process" and that he was a distraction and was disruptive. Day asked whether he was protected under the SOX whistleblower protection provision, and McGrath responded that Day was not protected because McGrath had investigated and found no fraud. Staples offered him three months' salary and outplacement services as part of a proposed severance package, which contained a general release of liability. Day felt the offer was "insulting" and did not accept it.

Four days later, on August 9, Kruse created a "Personnel Action Notice" regarding Day's termination. That document states that the reason for Day's termination was his "Inability to Perform Job." Day claims that he was never told the reason for his firing was his inability to perform his job and that he never received any type of written warning from Staples that his employment might be terminated.

B.        Prior Concerns About Day's Job Performance

Day's supervisors described many instances of serious dissatisfaction with Day's job performance independent of his complaints about potentially fraudulent business practices at Staples. These concerns about poor performance began approximately three weeks after Day began working at Staples -- one month before Day ever voiced concerns about possible fraud in Reverse Logistics practices to his supervisors -- and continued until his employment terminated.

On June 13, 2005, Day traveled to California for two weeks of training with Staples personnel, including Wendy Watanabe. Day clashed with his supervisors during the first days of this training. Day later testified in his deposition that he had a "rocky relationship" with Watanabe and that they "weren't compatible." In a July 18, 2005 email, sent in response to a request by Julio that she make a statement regarding Day's training, Watanabe stated that she had had difficulty with Day. She stated that he "was argumentative and sometimes [made] offensive comments about the process and [others'] ability to do their job." Another supervisor, Judith Gutierrez, and a co-worker, Scott Martin, also told Julio that Day was confrontational during the California training session.

On the July 4 holiday, Day called Julio at her home to ask for a co-worker's telephone number to complain about IT issues, during which he described the IT department as incompetent. Julio

-14-

felt it was inappropriate to call employees at home over the holiday and that the work should have been completed earlier.

On July 5, 2005, Day sent an email complaining about a courier company named SpeeDee. Day expressed concerns about SpeeDee's lack of responsiveness, which led to a number of returns being reissued. He complained that he was "getting the brush off" and experienced the equivalent of "a blank stare" over the phone. When Julio told Day to be more professional, he stated in an email that "[s]ometimes I may come across as rash, but it is all in an effort to get things taken care of . . . . Perhaps my downfall is that I say things that need to be said and sometimes don't worry if somebody is hurt or embarrassed, especially if they are in fact to blame."

Julio testified that during the July 14 meeting with Day, Day was demanding and constantly interrupted her and that "[a]ny explanation [she] would try to give him, he would just overpower." Day told Julio that he could do a better job in Reverse Logistics than Julio, that Julio was complacent in her job, and that she had not done anything to make any improvements in the returns process during the course of her working at Staples. Day conceded in his deposition that he had a "rocky relationship" with Julio.

Day's supervisors were further dissatisfied with his performance during the additional training he received to address concerns about his performance. Day was dismissive of the training

-15-

he received on July 26-28 and August 1.  Day questioned the efficacy of Staples's procedures and thought that his training on "Staples Values" on July 28 was a "waste of time."

His trainer Vicky Thomes, who instructed Day on proper telephone protocol, expressed frustration with Day's insistence on questioning many Staples customer service procedures.  She complained in an email to Julio that "[Day] just asks so many questions that have nothing to do with what we are working on at the time."  For example, Analysts calling to inquire about whether a return had been picked up were directed to say, "This is Staples quality control, and we were wondering how your return went."  Day, however, believed that this script was effectively "lying" because he would prefer to simply ask directly whether the courier had picked up the return.

In deciding ultimately to terminate Day's employment on August 5, Day's supervisors felt that he was inflexible, that he insisted he knew how to carry out Reverse Logistics functions better than his supervisors, and that he often threatened not to follow his managers' instructions.  Kruse cited Day's August 4 email as further evidence of Day's refusal to follow Staples internal processes.

C.        Day's SOX Whistleblower Violation Complaint

Day filed a complaint with OSHA on September 26, 2005, alleging retaliatory termination in violation of the SOX whistleblower protection provision, 18 U.S.C. § 1514A.  On November

23, 2005, the OSHA investigator concluded Day's claim lacked merit because Day's concerns appeared to be a "disagreement with management" about internal procedures and were not the "protected activity of alleging intentional deceit of shareholders or violations of [Securities and Exchange Commission ("SEC")] rules or regulations."[2] Day filed timely objections to the investigator's findings and requested an administrative hearing, which took place on March 3 and March 6, 2006. On March 14, 2006, Day filed a Notice of Intent to File a Complaint in District Court. The Administrative Law Judge accordingly dismissed the complaint.

Day filed his federal court complaint on April 11, 2006, alleging SOX and state-law claims. On February 7, 2008, the district court granted Staples's motion for summary judgment on all counts and denied Day's cross-motion for summary judgment.[3] The court held that Day's SOX claim failed as a matter of law because his belief that Staples was engaged in accounting fraud was not reasonable. The court reasoned that although "[Day's] concerns were stated with adequate particularity, Plaintiff's belief that he had uncovered fraud was not reasonable." Day, 573 F. Supp. 2d at 346. It based its decision in part on a determination that "Day lack[ed]

---

[2]     Day also filed a complaint against Staples in state court, but withdrew the action before the court reached a decision on Staples's motion for summary judgment.

[3]     Day does not appeal from the district court's entry of summary judgment on his state law promissory estoppel claim.

the knowledge, training and experience to harbor a reasonable belief of fraud." Id. The court emphasized that Day "had little relevant work experience" and had only worked in the Department for seven weeks before complaining of fraud. Id.

The court further held that Day's state-law claims failed because Staples had violated neither SOX nor its Code of Ethics. On February 11, Day filed a Motion to Amend Findings and Vacate Order, arguing the court erred in assuming that Day lacked experience and attempting to introduce evidence about Day's prior financial work experience. The court denied Day's motion. Day appeals only from the court's February 7, 2008 summary judgment ruling.

## II.

We review a district court's grant of summary judgment de novo and may affirm the district court's decision on any grounds supported by the record. Collazo v. Nicholson, 535 F.3d 41, 44 (1st Cir. 2008) (quoting Estades-Negroni v. Assocs. Corp. of N. Am., 377 F.3d 58, 62 (1st Cir. 2004)). Summary judgment is appropriate where "there is no genuine issue as to any material fact and . . . the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

III.

DAY'S SOX WHISTLEBLOWER CLAIM

A.        Statutory Background

SOX protects "whistleblower" employees of publicly-traded companies by prohibiting employers from retaliating against employees because they provided information about specified potentially unlawful conduct. 18 U.S.C. § 1514A; see Welch v. Chao, 536 F.3d 269, 275 (4th Cir. 2008). The provision states, in relevant part:

> No [publicly traded company] . . . may discharge, demote, suspend, threaten, harass, or in any other manner discriminate against an employee in the terms and conditions of employment because of any lawful act done by the employee . . . to provide information, cause information to be provided, or otherwise assist in an investigation regarding any conduct which the employee reasonably believes constitutes a violation of [18 U.S.C. § §] 1341 [mail fraud], 1343 [wire fraud], 1344 [bank fraud], or 1348 [securities fraud], any rule or regulation of the [SEC], or any provision of Federal law relating to fraud against shareholders, when the information or assistance is provided to . . . a person with supervisory authority over the employee . . . .

18 U.S.C. § 1514A(a)(1). There is no dispute that Staples is subject to the SOX whistleblower protection provision. It is useful to set this language in the context of the problem Congress was trying to address. Congress passed this protection in response to:

> [A] culture, supported by law, that discourage[s] employees from reporting fraudulent behavior not only to the proper authorities . . . but even internally. This

-19-

"corporate code of silence" not only hampers investigations, but also creates a climate where ongoing wrongdoing can occur with virtual impunity.

S. Rep. No. 107-146, at 5 (2002). Section 1514A was enacted to remedy this problem. The § 1514A whistleblower provision thus serves to "encourage and protect [employees] who report fraudulent activity that can damage innocent investors in publicly traded companies." Id. at 19. It also aimed "to provide federal protection to private corporate whistleblowers, as was already done with government employees, in light of the 'patchwork and vagaries of current state [whistleblower protection] laws.'" Carnero v. Boston Scientific Corp., 433 F. 3d 1, 11 (1st Cir. 2006) (emphasis omitted) (quoting S. Rep. 107-146, at 10).

An employee seeking § 1514A protection must first file an administrative complaint with the Department of Labor ("DOL"). § 1514A(b)(1)(A).[4] An administrative appeal to the DOL Administrative Review Board ("ARB") is available, but not mandatory.[5] After exhaustion of the DOL complaint procedure, the

---

[4] The Secretary of Labor has delegated responsibility for receiving and investigating whistleblower complaints to OSHA, an agency within the DOL. See Carnero, 433 F.3d at 3, n.1; Delegation of Authority and Assignment of Responsibility to the Assistant Secretary for Occupational Safety and Health, 67 Fed. Reg. 65,008, 65,008 (Oct. 22, 2002); see 29 C.F.R. § 1980.103(c).

[5] If the Secretary of Labor has not issued a final decision within 180 days of the filing of the complaint and there is no showing that such delay is due to the bad faith of the claimant, the claimant may file suit for de novo review in the appropriate federal district court, which will have jurisdiction over such

employee may then file a federal civil cause of action, or may, if he has chosen an administrative appeal, thereafter seek judicial review under the APA. See Carnero, 433 F.3d at 16-17 & n.16. An employee must file a complaint with the Secretary no later than ninety days after the date on which the alleged violation occurred. § 1514A(b)(2)(D).

The statute specifies that § 1514A claims are governed by the procedures applicable to whistleblower claims brought under the Wendell H. Ford Aviation Investment and Reform Act for the 21st Century, 49 U.S.C. § 42121(b). 18 U.S.C. § 1514A(b)(2); see also Carnero, 433 F.3d at 13 n.12. Under this burden-shifting framework, the employee bears the initial burden of making a prima facie showing of retaliatory discrimination because of a specific act. See 49 U.S.C. § 42121(b)(2)(B) ("The Secretary of Labor shall dismiss a complaint filed under this subsection and shall not conduct an investigation . . . unless the complainant makes a prima facie showing that [a whistleblower complaint] was a contributing factor in the unfavorable personnel action alleged in the complaint."). The burden then shifts to the employer to rebut the employee's prima facie case by demonstrating by clear and convincing evidence that the employer would have taken the same personnel action in the absence of the protected activity. 49 U.S.C.

---

action regardless of the amount in controversy. 18 U.S.C. § 1514A(b)(1)(B).

-21-

§ 42121(b)(2)(B); see also Welch, 536 F.3d at 275; Allen v. Admin. Review Bd., 514 F.3d 468, 475-76 (5th Cir. 2008).[6]

The requirements for a prima facie case are articulated in the DOL regulations. To make a prima facie showing, the employee's complaint must allege the existence of facts and evidence showing that: "(i) the employee engaged in a protected activity or conduct; (ii) the [employer] knew or suspected, actually or constructively, that the employee engaged in the protected activity; (iii) the employee suffered an unfavorable personnel action; and (iv) the circumstances were sufficient to raise the inference that the protected activity was a contributing factor in the unfavorable action."  29 C.F.R. § 1980.104(b)(1).

SOX authorizes an award of make-whole relief to an employee who prevails in the DOL administrative proceedings.  This can include reinstatement with "the same seniority status that the employee would have had but for the discrimination," "back pay, with interest," and compensation for any special damages sustained,

---

[6]    This prima facie case under SOX is not identical to that under Title VII and McDonnell Douglas, which requires the plaintiff to show (1) he is a member of a protected class; (2) he was qualified for the job; (3) the employer took an adverse employment action; and (4) the position remained open or was filled by a person with similar qualifications.  See St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506 (1993).  Indeed, the SOX burden may be more difficult to meet because an inference does not arise automatically if the four criteria are met, but only when the circumstances are sufficient to raise an inference and because the employee must show that he engaged in the protected activity.

including litigation costs, and reasonable attorneys' fees. See 18 U.S.C. § 1514A(c)(2); see also 29 C.F.R. § 1980.105(a).

B.        Application of SOX Whistleblower Provision to the Facts of Day's Case

This case turns on the appropriate interpretation of the applicable legal standards.

We focus on the statutory requirement that a SOX complainant be a person who "provide[s] information . . . regarding any conduct which the employee reasonably believes constitutes a violation" of the pertinent laws listed in § 1514A, here securities fraud or shareholder fraud. Here, the complaint alleges Day reasonably believed that Staples violated § 1514A through its manipulation of accounting data, and that the data manipulation violated an unidentified "relevant provision" of federal law relating to fraud against shareholders. The issue is what constitutes a reasonable belief that the conduct constitutes securities fraud.

There are some common understandings about the viewpoints with which to approach the question of what is a reasonable belief. Both the DOL regulations, which are entitled to Chevron deference,[7]

_____

[7]    Chevron deference is appropriate when it appears from the "statutory circumstances that Congress would expect the agency to be able to speak with the force of law." United States v. Mead Corp., 533 U.S. 218, 229 (2001); see also Rucker v. Lee Holding Co., 471 F.3d 6, 11-12 (1st Cir. 2006). The Supreme Court has instructed that "Congress['s] contemplat[ion] [of] administrative action with the effect of law [can be assumed] when it provides for a relatively formal administrative procedure" such as formal

-23-

and the caselaw[8] establish that the term "reasonable belief" has both a subjective and objective component.  We agree.  That two-component approach is consistent with the legislative history of the provision.[9]

As to the subjective component, the law is not meant to protect those whose complaints are not undertaken in subjective good faith.  Here, there is no evidence that Day did not make his complaints in subjective good faith.[10]

---

adjudication.  Mead, 533 U.S. at 230 & n.12.  Congress explicitly delegated to the Secretary of Labor authority to enforce § 1514A by formal adjudication, see 18 U.S.C. § 1514A(b)(1)(A), and the Secretary has delegated her enforcement authority to the ARB, see Delegation of Authority and Assignment of Responsibility to the Administrative Review Board, 67 Fed. Reg. 64,272 (Oct. 17, 2002).

[8]  See Welch, 536 F.3d at 275 (holding that an employee had to show both a subjective belief and an objectively reasonable belief that the conduct he complained of constituted a violation of relevant law); Livingston v. Wyeth, Inc., 520 F.3d 344, 352 (4th Cir. 2008); Allen, 514 F.3d at 477; Melendez, ARB No. 96-051 (July 14, 2000), available at http://www.oalj.dol.gov/PUBLIC/WHISTLEBLOWER/DECISIONS/ARB_DECISIONS/ERA/93ERA06E.HTM.

[9]  The legislative history states that Congress "intended to impose the normal reasonable person standard used and interpreted in a wide variety of legal contexts . . . ." S. Rep. No. 107-146, at 19.  It also states that "[t]he threshold is intended to include all good faith and reasonable reporting of fraud, and there should be no presumption that reporting is otherwise, absent specific evidence."  148 Cong. Rec. 57420 (daily ed. July 26, 2002) (statement of Sen. Leahy).

[10]  We consider the district court's concern about the plaintiff's particular educational background and sophistication to be relevant to the subjective component. Subjective reasonableness requires that the employee "actually believed the conduct complained of constituted a violation of pertinent law."  Welch, 536 F.3d at 277 n.4.

-24-

We focus on whether Day had an objectively reasonable belief that the conduct constituted securities fraud or shareholder fraud. The plain language of SOX does not provide protection for any type of information provided by an employee but restricts the employee's protection to information only about certain types of conduct. Those types of conduct fall into three broad categories: (1) a violation of specified federal criminal fraud statutes: 18 U.S.C. § 1341 (mail fraud), § 1343 (wire fraud), § 1344 (bank fraud), § 1348 (securities fraud); (2) a violation of any rule or regulation of the SEC; and/or (3) a violation of any provision of federal law relating to fraud against shareholders. The first and third categories share a common denominator: that the conduct involves "fraud," and many of the second category claims (violations of SEC rules or regulations) will also involve fraud.

The employee must show that his communications to the employer specifically related to one of the laws listed in § 1514A. We agree with the Fourth Circuit in Welch, 536 F.3d at 275, that § 1514A requires, in addition to a subjective belief, an objectively reasonable belief that conduct complained of constituted a violation of the relevant law set out in the statute. The employee is not required to provide the employer with the citation to the precise code provision in question.[11] The employee is not required to show

_____

[11]    In comments to the final regulations implementing the whistleblower provision, DOL stated it:

that there was an actual violation of the provision involved. See, e.g., Fraser v. Fiduciary Trust Co. Int'l, 417 F. Supp. 2d 310, 322 (S.D.N.Y. 2006) ("While a plaintiff need not show an actual violation of law, or cite a code section he believes was violated, 'general inquiries . . . do not constitute protected activity.'") (alteration in original) (citations omitted) (quoting Fraser v. Fiduciary Trust Co. Int'l, No. 04 Civ. 6958 (RMB)(GWG), Slip op. at 16 (S.D.N.Y. June 23, 2005)). Here, plaintiff's theory, both before the employer and before the court is a generalized theory that shareholder fraud resulted from three specific practices at Staples.[12]

---

> [B]elieve[d] that it would be overly restrictive to require a complaint to include detailed analyses when the purpose of the complaint is to trigger an investigation to determine whether evidence of discrimination exists . . . . Although the [SOX] complainant often is highly educated, not all employees have the sophistication or legal expertise to specifically aver the elements of a prima facie case and/or supply evidence in support thereof.

Procedures for the Handling of Discrimination Complaints Under the Sarbanes-Oxley Act, 69 Fed. Reg. 163, 52106 (Aug. 24, 2004).

[12] Day specifically theorizes that all three practices "violated the Act's enumerated laws," without citing a specific statue or SEC regulation. Although he has waived the argument on appeal, with respect to the use of log notes in issuing credits to contract customers, he also alleges a violation of the Foreign Corrupt Practices Act's ("FCPA") requirement that publicly traded companies "make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer." 15 U.S.C. § 78m(b)(2)(A). This claim is subject to the same infirmities as

The reasonableness of Day's belief for purposes of § 1514A must be measured against the basic elements of the laws specified in the statute. "Fraud" itself has defined legal meanings and is not, in the context of SOX, a colloquial term. "The hallmarks of fraud are misrepresentation or deceit." Ed Peters Jewelry Co. v. C & J Jewelry Co., 215 F.3d 182, 191 (1st Cir. 2000). That is the dictionary definition, as well. See Black's Law Dictionary 685 (8th ed. 2004) (defining fraud as the "knowing misrepresentation of the truth or concealment of a material fact to induce another to act to his or her detriment"). Wire or mail fraud is "broader than the common law definition [of fraud]" but also emphasizes the deceit requirement. Ed Peters Jewelry Co., 215 F.3d at 192.

To have an objectively reasonable belief there has been shareholder fraud, the complaining employee's theory of such fraud must at least approximate the basic elements of a claim of securities fraud. "Securities fraud" itself has additional relevant elements. The elements of a cause of action for securities fraud "resembl[e] . . . common-law tort actions for deceit and misrepresentation." Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 341 (2005). Those elements typically include a material misrepresentation or omission, scienter, loss, and a causal connection between the misrepresentation or omission and the loss. See, e.g., Media Gen., Inc. v. Tomlin, 532 F.3d 854, 858 (D.C. Cir.

his other claims, as explained later.

-27-

2008).   Securities fraud under section 10(b) and Rule 10b-5 requires: "(1) a material misrepresentation or omission; (2) scienter; (3) connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation." Ezra Charitable Trust v. Tyco Int'l, Ltd., 466 F.3d 1, 6 (1st Cir. 2006). The employee need not reference a specific statute, or prove actual harm, but he must have an objectively reasonable belief  that the company intentionally misrepresented or omitted certain facts to investors, which were material and which risked loss.

Day's assertions do not meet the basic components of fraud or of securities fraud.  A disagreement with management about internal tracking systems which are not reported to shareholders is not actionable.  Several of Day's complaints amount to allegations that the company's practices did not maximize shareholder profits.[13] Day's belief is not itself an objectively reasonable belief that shareholders have been or are likely to be defrauded.  A company may legitimately decide for a number of reasons that maximizing short-term profits through certain practices is not its goal, particularly if the practices lead to consumer unhappiness.  Further, a company's management may legitimately decide that certain practices are more efficient than others.  A complaint about corporate efficiency is also not within the intended protection of SOX.

---

[13]   This is true of the two claims about the company's practices that benefit Staples customers or couriers to the possible detriment of the company's bottom line.

-28-

Similarly, Day's belief that the process of canceling and reissuing return orders constituted fraud on shareholders because it permitted courier overbilling lacks objective reasonableness. The aging days metric that Day describes as "data manipulation" was unrelated to the financial condition of the company, and it was never reported to shareholders. Day argues that the practice led to a "needless loss of revenue [that] detrimentally affected Staples' shareholders." A claim of "needless loss of revenue" is not a claim of fraud. Even if Staples's pick-up order system allowed the possibility of overbilling by a delivery company, as Day alleged, that is a far cry from fraud. Moreover, Day had no reasonable basis for his erroneous belief that Julio's bonus depended on the aging days metric.

One practice was said to benefit Staples to the detriment of its customers -- that the Reverse Logistics Department "was knowingly refusing to provide its customers with monetary credit they were entitled to," thus giving Staples an "unfair benefit." This is not even plausibly a situation of shareholder fraud. "[A] billing discrepancy, without more, does not equal fraud." Platone v. U.S. Dep't of Labor, 548 F.3d 322, 327 (4th Cir. 2008) (holding that under § 1514A, "a complainant must alert management to more than the fact that the company's near-term profits were affected by billing discrepancies in order to meet the standard of definitively and specifically alleging mail or wire fraud" and rejecting claim

-29-

of plaintiff who never articulated theory of how employer was defrauding shareholders to the employer). Day may have made a complaint related to consumer protection, but he does not have an objectively reasonable belief there was shareholder fraud under § 1514A.

Day attempts to connect these allegations to violations of "general accounting principles" and then to connect violations of accounting principles to "shareholder fraud."[14] Indeed, he was explicit with Staples "that [its] accounting methods are inaccurate" and that "the information [Staples] sends to Wall Street is inaccurate." This theory does not work either. He has not alleged that the numbers he complained were inaccurate (1) were reported to shareholders, (2) were inconsistent with generally accepted accounting principles ("GAAP"), or (3) constituted fraud. A generalized allegation of inaccuracy in accounting is insufficient to establish a reasonable belief in a violation of GAAP, much less a reasonable belief in shareholder fraud. See DSAM Global Value Fund v. Altris Software, Inc., 288 F.3d 385, 390 (9th Cir. 2002) ("'[T]he mere publication of inaccurate accounting figures, or a failure to follow GAAP, without more, does not establish scienter'" in a securities fraud action) (quoting In re Software Toolworks Inc., 50 F.3d 615, 627 (9th Cir. 1994)).

---

[14] The brief also makes an unspecified reference to SEC regulations; without more, the argument is waived.

Further, "merely stating in conclusory fashion that a company's books are out of compliance with GAAP would not in itself demonstrate liability under section 10(b) or Rule 10b-5." In re Cabletron Sys., Inc., 311 F.3d 11, 34 (1st Cir. 2002). Even when a company's accounting method is in violation of GAAP, "some techniques . . . might prove to be entirely legitimate, depending on the specific facts." Id. at 34-35. Claims that there has been accounting fraud thus require evidence beyond a belief in a mere accounting irregularity, and not even an accounting irregularity can be reasonably alleged here. See Novak v. Kasaks, 216 F.3d 300, 309 (2d Cir. 2000) ("[A]llegations of GAAP violations or accounting irregularities, standing alone, are insufficient to state a securities fraud claim. Only where such allegations are coupled with evidence of 'corresponding fraudulent intent,' might they be sufficient." (citations omitted) (quoting Chill v. Gen. Elec. Co., 101 F.3d 263, 270 (2d Cir. 1996))). Day's allegations are not of "accounting fraud"[15] within the meaning of securities law. See, e.g., Joy, Case No. 2007-SOX-74, 2008 DOLSOX LEXIS 5, at *20 (2008)

---

[15] Day's citation to the FCPA does not help him. Even assuming arguendo that the FCPA falls within the scope of § 1514A, but see Diamond, Case No. 2006-SOX-00044, 2007 DOLSOX LEXIS 97, at *15-16 (2007) (questioning whether FCPA sufficiently relates to fraud against shareholders within the meaning of § 1514A), Day's argument that Staples inaccurately "report[ed] increased revenues" is itself inaccurate in two ways: first, his criticism about the practice attacks the fairness, rather than the accuracy per se of Staples's calculation of its total revenues; second, Day's claim is unreasonable in light of the business reasons Staples articulated for adopting its policies.

("[SOX] does not provide whistleblower protection for all employee complaints about how a public company spends its money and pays its bills.").

Day's belief was also objectively unreasonable because he has made no showing that any inaccuracy was material to shareholders. This materiality requirement means the complainant must believe there is a "likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." Basic, Inc. v. Levinson, 485 U.S. 224, 231-32 (1988) (quoting TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976)) (internal quotation marks omitted). Thus complaints about purely internal practices that are not financial in nature and are not reported to shareholders do not meet the materiality requirement for an objectively reasonable belief in shareholder fraud.

A company's explanations given to the employee for the challenged practices are also relevant to the objective reasonableness of an employee's belief in shareholder fraud. As the district court observed, Day's complaints, which, assuming arguendo, initially reflected a reasonable concern, "ceased to be reasonable after Staples' employees reiterated the rationales for the returns process, and assured Plaintiff that no fraud was being committed." Day, 573 F. Supp. 2d at 347. Here, Day's beliefs were not initially

reasonable as beliefs in shareholder fraud and they became less reasonable as he was given explanations.

Because, on the undisputed facts, Day did not have the needed objectively reasonable belief of violation of one of the laws set forth in § 1514A, we need not determine whether Staples has proved by clear and convincing evidence that Day would have been discharged notwithstanding his complaints.

IV.

DAY'S STATE LAW CLAIMS

We also review de novo entry of summary judgment against Day's state claims for breach of contract and wrongful termination under Massachusetts law.  Both claims fail.

A.        Breach of Contract Based on Staples's Code of Ethics

Day argues that Staples's Code of Ethics, which contains an anti-retaliation provision protecting employees who report legal or ethical violations to their supervisors,[16] was an implied part of his employment contract, and that Staples breached its obligations under the Code by firing him.

In Massachusetts, employment is presumed to be at-will unless there exists an express or implied contract governing its terms and conditions.  Hinchey v. NYNEX Corp., 144 F.3d 134, 141

---

[16]    This provision states, "Staples will not tolerate retaliation against anyone who in good faith reports a violation or potential violation of this Code."

(1st Cir. 1998).  Day argues that under O'Brien v. New England Telephone & Telegraph Company, 664 N.E.2d 843, 847 (Mass. 1996), the terms of the Code became an implied part of the at-will employment relationship between Day and Staples.[17]

The Massachusetts Supreme Judicial Court has held that there is no implied contract based on the terms of a personnel manual where: (1) the employer retained the right to unilaterally modify terms; (2) the terms of the manual were not negotiated; (3) the manual stated that it provided only guidance regarding the employer's policies; (4) no term of employment was specified in the manual; and (5) the employee did not sign the manual to manifest assent.  Jackson v. Action for Boston Cmty. Dev., Inc., 525 N.E.2d 411, 415-16 (Mass. 1988).  There is no "rigid list of prerequisites, but rather . . . factors that would make a difference or might make a difference in deciding whether the terms of a personnel manual were at least impliedly part of an employment contract."  O'Brien, 664 N.E.2d at 847; see also LeMaitre v. Mass. Tpk. Auth., 897 N.E.2d 1218, 1218-19 (Mass. 2008) (finding enforceable an incentive program

---

[17]    Day cites Noonan v. Staples, Inc., 539 F.3d 1 (1st Cir. 2008), for the proposition that this court has previously treated the Code as a binding contract, and that Staples cannot fire Noonan for a violation of the Code in one case while arguing that Day lacks a reasonable belief in shareholder fraud.  Day's reliance is misplaced.  Noonan examined the Code in the context of a claim for breach of a severance agreement where the terms of the severance agreement stated that Staples could rely on a violation of the Code to establish cause for termination.  See id. at 14.  Noonan has no bearing on Day's case.

-34-

described in employee handbook and clarifying that the case did not raise claim that handbook modified at-will status of a dismissed employee).

Day's characterization of the Code of Ethics as a contract ignores the express contrary language in the documents accompanying the Code. Day's initial offer explicitly stated, "[t]his letter, along with the enclosures [including the Code of Ethics], contains our complete offer of employment and in no way changes your status as an at-will employee." Further, the Associate Handbook Acknowledgment Form, contained within the Staples Associate Handbook, states (in all capital letters): "I also understand that this handbook is not a contract of employment, and that employment with Staples is on an at-will basis." The Associate Handbook also contains a notification that the first 90 days of an associate's employment are considered the introductory period, and that "[s]ince employment is at the will of the company and of the associate, completion of the introductory period is not a guarantee or a right to continued employment." These statements make clear that the Code and benefits provided in the Handbook did not alter Day's at-will employment status.

Given these disclaimers, the absence of any negotiation over the terms, and the absence of any specified term of employment, Day could not "reasonably have believed that the 'employment manuals he . . . was given constituted the terms or conditions of

employment, equally binding on employee and employer.'" Hinchey, 144 F.3d at 141 (quoting Derrig v. Wal-Mart Stores, Inc., 942 F. Supp. 49, 55 (D. Mass. 1996)).

B.    Wrongful Termination Claim Based on Public Policy Exception to Massachusetts's Doctrine of At-Will Employment

Lastly, Day argues that Staples's violation of § 1514A provides him with a basis for a wrongful discharge claim pursuant to the public policy exception to Massachusetts's employment-at-will doctrine. He further relies on Massachusetts case law giving protection to whistleblowers under state law. See, e.g., Mello v. Stop & Shop Cos., 524 N.E.2d 105, 108 n.6 (Mass. 1988).

Massachusetts courts recognize an exception to the general at-will employment rule "when employment is terminated contrary to a well-defined public policy." Wright v. Shriners Hosp. for Crippled Children, 589 N.E.2d 1241, 1244 (Mass. 1992). Under this doctrine, employees may seek redress if they "are terminated for asserting a legally guaranteed right (e.g., filing workers' compensation claim), for doing what the law requires (e.g., serving on a jury), or for refusing to do that which the law forbids (e.g., committing perjury)." Smith-Pfeffer v. Superintendent of the Walter E. Fernald State Sch., 533 N.E.2d 1368, 1371 (Mass. 1989). This public policy exception is construed narrowly. King v. Driscoll, 638 N.E.2d 488, 492 (Mass. 1994).

Day does not have a claim for wrongful termination under Massachusetts common law.  In passing SOX, Congress aimed to create comprehensive legislation to fill the gaps in a patchwork of state laws governing corporate fraud and protections for whistleblowers. It would be entirely inappropriate for plaintiff to be able to use a federal statute designed to address the inadequacies of state law to create a new common law cause of action under Massachusetts law. Nor does Day meet the requirements of existing state law.  The Massachusetts public policy exception for whistleblowing does not protect "an employee's internal complaint about company policies." Shea v. Emmanuel Coll., 682 N.E.2d 1348, 1350 (Mass. 1997).

## V.

The district court's grant of summary judgment to Staples is affirmed.