*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 15-CV-752

**11/09/2017**
FILED
District of Columbia
Court of Appeals

Julio Castillo
Clerk of Court

BARBARA HARRISON PYLES, APPELLANT,

v.

HSBC BANK USA, N.A., AS TRUSTEE FOR WELLS FARGO ASSET SECURITIES CORPORATION, *et al*., APPELLEES.

Appeal from the Superior Court
of the District of Columbia
(CAR-3095-10)

(Hon. Erik P. Christian, Trial Judge)

(Argued November 30, 2016                    Decided November 9, 2017)

*Barry Coburn*, with whom *Lloyd Liu* was on the brief, for appellant.

*Mary C. Zinsner*, with whom *S. Mohsin Reza* was on the brief, for appellees.

Before GLICKMAN, *Associate Judge*, and WASHINGTON and STEADMAN, *Senior Judges*.[*]

STEADMAN, *Senior Judge*:   Appellant Barbara Harrison Pyles alleges that she was duped by her husband, appellee John C. Pyles III, into subjecting her

---

[*]   Judge Washington was Chief Judge at the time of argument. His status changed to Senior Judge on March 20, 2017.

formerly separately owned property, the family home, to a deed of trust to secure a bank loan, made to her husband alone. Now threatened with foreclosure on the deed of trust, she seeks to set aside the transaction and restore her position as the sole owner of the property free and clear of the deed of trust. The trial court dismissed her complaint as to all parties under Super. Ct. Civ. R. 12 (b)(6) for failure to state a claim upon which relief can be granted. We conclude that the complaint was sufficient to survive dismissal under that rule as to Mr. Pyles and remand for further proceedings.

## I. Factual and Procedural Background[1]

Upon the death of her former husband in 1992, appellant became the sole owner of the family home located at 2812 Chesterfield Place, N.W., Washington, D.C. The acquisition of the property in 1985 had been financed in part by a mortgage on the home. In 1995, appellant married John C. Pyles III. He with his four minor children moved into the home but she resisted several attempts he made to change the ownership to joint title. He knew that she wanted to provide for her

---

[1] The facts are taken from the third amended complaint with its exhibits and are accepted as true, as required in ruling on a 12 (b)(6) motion. *See Duncan v. Children's Nat'l Med. Ctr.*, 702 A.2d 207, 210 (D.C. 1997).

retirement[2] and her children's future by maintaining sole ownership of the home. The two generally kept their finances separate, but Mr. Pyles made the mortgage payments on the home.

Mr. Pyles was a real estate developer and president of Washington Management & Development Company. For a number of years, he had enjoyed credit arrangements with the Bank[3] without being required to provide secured collateral. However, in early 2007, the Bank approached Mr. Pyles to "restructure certain of his business debts" and insisted that a loan of $3.6 million be on a secured basis. Otherwise, the Bank threatened to call Mr. Pyles's outstanding debt of approximately $15 million. The Bank "pressured" Mr. Pyles to use the Chesterfield home as collateral, although it knew that he had no ownership interest in the home at that point. Originally, the Bank requested that Mr. Pyles include appellant on the application for the loan. However, subsequently, the Bank said

---

[2] Appellant was a local television anchor for NBC 4 and the reporter of a weekly segment on NBC's "Wednesday's Child." She has a master's degree in journalism but no formal training or experience in business, finance or real estate.

[3] In fact, a number of financing institutions and certain of their employees have been named as defendants, along with Mr. Pyles himself. For purposes of this appeal of the 12 (b)(6) motion, nothing turns on the somewhat complex relationships between these institutions. Therefore, for ease of understanding, all the financing defendants are encompassed within the term Bank, and the facts are stated as if only a single entity were involved.

that the application should be in Mr. Pyles's name alone; otherwise, the loan would not be eligible for approval. It was agreed that Mr. Pyles would provide the home as collateral and the transaction would be structured as a refinancing of the mortgage. According to the complaint, all of the loan-related documents describe the loan "as or pertaining to a residential mortgage transaction" and state that "the purpose of the loan was to refinance Mr. Pyles's primary residence.[4] The deed of trust provided for equal monthly payments for a period of thirty years. At the "request" of or as "instructed" or "directed" by the Bank, Mr. Pyles set out to obtain appellant's signature to the relevant documents.[5]

This plan led to the crucial event in this appeal. On April 25, 2007, appellant worked three broadcasts, requiring her to leave her home at 3:30 a.m. Just as she was rushing to leave, Mr. Pyles asked her to sign "some documents related to his business," without further explanation. Two of the documents were a deed transferring title to appellant and Mr. Pyles as tenants by the entirety and a

---

[4] None of the documents attached to the complaint as exhibits appears to contain any such statement as to purpose.

[5] The complaint does not reveal why it was necessary that ownership of the home be transferred to co-ownership rather than appellant simply executing a deed of trust on her separately owned property to secure her husband's promissory note. Presumably this was done at the insistence of the Bank in order to give Mr. Pyles an interest in the property to support the structure of a refinancing of a residential mortgage.

deed of trust securing a loan for $3.6 million. Mr. Pyles presented only the signature pages of these documents to appellant. She also signed a disclosure statement under the Truth in Lending Act, the entire text of which was presented to her. As she states in her complaint, "because Ms. Pyles trusted in and relied upon her husband, she signed the documents as he requested." She previously had relied without incident on Mr. Pyles's representations as to the contents of certain documents on which he requested her signature. Both the deed and the deed of trust bore the signature of a witness and a notarization, which were subsequently falsely added by assistants to Mr. Pyles.[6] The deed of trust bore Mr. Pyles's initials on each of its fourteen pages but not those of appellant. The deed of trust, the crucial document in its litigation, and the Truth in Lending Act disclosure form name appellant as a "borrower" or "applicant" along with her husband. The loan transaction then proceeded as agreed to by Mr. Pyles and the Bank.

Throughout this entire period, no communication of any kind ever took place between appellant and the Bank concerning the documents or the loan itself. Appellant did not become aware of the nature of the documents that she had signed

---

[6] Appellant invokes the allegations of improper notarization of her signature as a ground to void the instruments. But however relevant it may be to supporting a claim of fraud, such a defect does not invalidate the instrument made by an individual. *See* D.C. Code §§ 42-601, 801 (2001).

until late 2008, in connection with a threatened suit involving other business debts of her husband's company. Appellant apparently took no action at that point, but on January 8, 2010, the Bank commenced foreclosure proceedings under the deed of trust on the home. On January 15, through counsel, appellant sent a letter to the Bank disputing the validity of the deed of trust. In a second letter on February 1, she asserted her right to rescind under the Truth in Lending Act. Subsequently, she commenced litigation challenging the validity of the documents. The version of the complaint now before us, her third amended complaint filed on April 6, 2012, sought declaratory relief voiding the deed and deed of trust, an injunction against any action thereon by the Bank, damages for statutory violations and otherwise, and attorney's fees. The trial court granted the Bank's 12 (b)(6) motion on February 14, 2014. A motion for reconsideration was denied on June 19, 2015, and a timely appeal taken to this court.[7]

---

[7] Appellee's brief informs us that no foreclosure action has yet been taken and that appellant and Mr. Pyles are continuing to reside in the home. The dismissal included not only all claims against the Bank but also against Mr. Pyles. This dismissal of Mr. Pyles was specifically challenged and rejected in the motion for reconsideration. Although originally represented by counsel, he is now *pro se.* He has filed no brief in this appeal nor did he seek to appear at oral argument.

## II. Analysis

Before us is a challenge to a dismissal under Super. Ct. Civ. R. 12 (b)(6) for failure to state a claim in the complaint.  We fairly recently en banc set forth the standard for review of such a dismissal, which is *de novo*.  "[W]e accept the allegations of the complaint as true, and construe all facts and inferences in favor of the plaintiff . . . [t]he only issue on review of a dismissal made pursuant to Rule 12 (b)(6) is the legal sufficiency of the complaint and a complaint should not be dismissed because a court does not believe that a plaintiff will prevail on [his] claim.  Indeed it may appear on the face of the pleadings that a recovery is very remote and unlikely but that is not the test."  *Grayson v. AT&T Corp.*, 15 A.3d 219, 228-29 (D.C. 2011) (en banc) (citations omitted).  A complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Family Fed'n for World Peace & Unification Int'l v. Hyun Jin Moon*, 129 A.3d 234, 245 (D.C. 2015) (citation omitted).  *See also Poola v. Howard Univ.*, 147 A.3d 267, 276 (D.C. 2016).  But "[a] court should be circumspect in assessing the sufficiency of a complaint in any case where the substantive legal standard requires a fact-intensive inquiry."  *Potomac Dev. Corp. v. District of Columbia*, 28 A.3d 531, 544 (D.C. 2011).

## A. Common-law Fraud: John C. Pyles III

At the outset, appellant invokes lack of mutual assent and fraud as the common-law legal principles that invalidate her signature to the documents.[8] "We have . . . consistently adhered to a general rule that one who signs a contract has a duty to read it and is obligated according to its terms. . . . absent fraud or mistake, one who signs a contract is bound by a contract which he has an opportunity to read whether he does so or not." *Pers Travel, Inc. v. Canal Square Assocs*., 804 A.2d 1108, 1110 (D.C. 2002) (citations omitted).[9] While appellant may have chosen to sign the contracts as she was going off to work, no allegation is made that she had no other choice than to sign at that point. Her signature on the documents must constitute assent unless it was obtained by fraud.[10]

---

[8] Appellant also invokes the equitable principle of unclean hands, but no facts are alleged that would differentiate such a disposition from a fraud analysis.

[9] This position is based on the objective theory of contracts, whereby "contractual obligation depends on *manifestation* of assent rather than mental state [or meeting of the minds.]" *Hernandez v. Banks*, 65 A.3d 59, 70 (D.C. 2013) (en banc) (quoting Restatement (Second) of Contracts § 15 cmt. A) (emphasis added in opinion).

[10] No argument is made based on mistake, a doctrine that generally addresses mistakes as to the factual situation surrounding the transaction. See E. Allen Farnsworth, 1 Farnsworth on Contracts § 9.4 (3d ed. 2004).

The criteria to prove common-law fraud are well-established. Briefly put, a plaintiff must show that the defendant, with the intent to deceive the plaintiff, knowingly made a false representation of a material fact on which plaintiff justifiably and detrimentally relied. *See Sibley v. St. Albans School*, 134 A.3d 789, 808-09 (D.C. 2016). In alleging fraud, the circumstances constituting the fraud must be stated in the complaint with particularity. Super Ct. Civ. R. 9 (b). It has also been said that, because fraud requires a reasonable reliance on a misrepresentation, claims may be defeated by a plaintiff's own recklessness or where the plaintiff "should have discovered the facts." *Media Gen., Inc. v. Tomlin*, 505 F. Supp. 2d 51, 61 (D.D.C. 2007) (quoting *Royal Am. Managers, Inc. v. IRC Holding Corp.*, 885 F.2d 1011, 1015 (2d Cir. 1989)), *affirmed in part and reversed in part*, 532 F.3d 854 (D.C. Cir. 2008).[11]

The trial court here ruled that no misrepresentations had been made by Mr. Pyles in his statement that she was signing "some documents relating to his business." Appellant correctly points out that this overlooks the principle that fraud may be committed by the omission of material facts, especially when a

---

[11] This statement was made in consideration of the question whether the plaintiff "justifiably" relied. See footnote 12 *infra.*

partial explanation has been rendered. *See Saucier v. Countrywide Home Loans*, 64 A.3d 428, 438-40 (D.C. 2013). A fiduciary or confidential relationship may require the furnishing of information beyond that required in a strictly commercial context. Restatement (Second) of Contracts § 161 (d) and cmt. F ("[s]uch a [confidential] relationship normally exists between members of the same family"); Richard A. Lord, 26 Williston on Contracts § 69:23 (4th ed. 2003). The trial court also ruled that appellant's reliance on Mr. Pyles had been unjustified or unreasonable when she had the chance to examine the documents. This ruling also overlooks the importance of a confidential relationship such as marriage. *See Hale v. Hale*, 539 A.2d 247, 251 (Md. Ct. Spec. App. 1988) ("Whether a confidential relationship exists between husband and wife [is] a question of fact," dependent on a number of factors.) (quoting *Bell v. Bell*, 379 A.2d 419 (Md. Ct. Spec. App. 1977)). That confidential relationship may, in turn, justify reliance on the good faith of the other. *Id.*[12]

---

[12] See 27 Williston on Contracts, *supra*, § 69.34 at p. 32 ("Especially where there is a relation of natural trust and confidence, although not strictly a fiduciary relationship, the failure of the defrauded party to exercise ordinary prudence or vigilance will not deprive it of redress."). Indeed, "[t]the growing trend and tendency of the courts will continue to move toward the doctrine that negligence in trusting in a misrepresentation will not excuse positive willful fraud or deprive the defrauded person of a remedy." *Id.* at p. 26. See also Restatement (Second) of Contracts § 172. This approach of course addresses disputes between the two parties directly involved in the fraud as opposed to situations involving third parties, which present other considerations.

While the precise nature of the relationship between the Pyles to justify such reliance may be subject to further exploration, the allegations in the complaint must be held sufficient to survive a 12 (b)(6) motion insofar as it seeks relief against Mr. Pyles.

## B. **Liability of the Bank**

Appellant's complaint seeks recovery against the Bank not only on fraud grounds but on allegations of violation of three statutes. In addressing those grounds in the context of a 12 (b)(6) motion, we are struck by the incompleteness of our knowledge at this pre-discovery stage of the complete picture of the details of this apparently somewhat unusual loan transaction between Mr. Pyles and the Bank with a number of unexplained aspects.

Among other things, we do not know the degree to which the procedures followed in this case followed the normal banking pattern for the Bank or for the banking industry generally.[13] We know nothing about Mr. Pyles's overall financial situation that led to the Bank's pressing him to renegotiate his relationship with the

---

[13] As appellant points out, the dismissal of the case prior to discovery gave her "no opportunity to explore the [Bank's] normal procedures or how the procedures utilized here deviated from them."

12

Bank. We know very little about those negotiations themselves. We do not know how the prospect of the family home as security came up or what discussions took place with respect thereto. We do not know why the transaction was structured as a "residential mortgage refinancing," to the point that the note provided for the level monthly payments over a term of thirty years common to home loans. We do not know why appellant was originally slated to be one of the borrowers and then removed from that status. We do not know why only Mr. Pyles's initials appear on the pages of the deed of trust. We do not know why the Bank insisted that the property be transferred from appellant's sole ownership to a tenancy by the entirety as a condition of the loan. We do not know what discussions took place between the Bank and Mr. Pyles about the security arrangement. We do not know why, although appellant was a key player in the transaction through the deed and the deed of trust on her own home, on which she was actually named as a "borrower," the Bank had no contact whatever with her at any time and instead relied on Mr. Pyles as the intermediary. We do not know precisely how in fact the loan proceeds were used and in what amounts.[14]

---

[14] An affidavit by Mr. Pyles in the record states simply that "the loan was used to pay an existing mortgage on the home and the *remainder* was used for a commercial project." (emphasis added).

A basic issue is whether proof of fraud by Mr. Pyles can be shown to implicate the Bank.[15] "Courts have historically taken the position that fraudulent misrepresentations inducing the person to whom the misrepresentations are addressed to enter into a contract with someone other than the maker of the representations will not give the defrauded person ground either for rescinding the transaction or for an action for damages against the innocent other person to the contract." 26 Williston on Contracts, *supra*, § 69:14 at p. 556.[16] However, there are a number of exceptions to this principle, here most notably (1) where the person making the misrepresentations was the "actual or purported agent of the person receiving the benefit of the fraud" and (2) even when the defrauder is not an agent, the party benefiting from the transaction "was or should have been cognizant" of the misrepresentations. *Id.* at pp. 557, 562.; see also Restatement (Second) of Contracts § 164 (2).

---

[15] Appellant asserts that, if proven, Mr. Pyles's fraud renders the documents "void." This is not correct. Fraud of the type here renders a document only "voidable," a right lost if the document passes to a person acting in good faith. Restatement (Second) of Contracts § 164 (1).

[16] The deed creating the tenancy by the entirety was of course not a contract to which the Bank was a party. But the critical document affecting the Bank and to which it was a party was the deed of trust. That document would have been effective to subject appellant's interest in the property even if the deed of the tenancy by the entirety were set aside.

The trial court understandably did not concern itself with these principles in ruling against any common-law liability of the Bank because it concluded that no misrepresentation had in fact taken place and that appellant's reliance on Mr. Pyles was unreasonable and unjustified. As already mentioned, this conclusion overlooked the importance of the possible confidential relationship between appellant and Mr. Pyles to establish fraud, which underlies our reversal of the dismissal of Mr. Pyles. The trial court therefore never addressed the issue whether, if fraud indeed had taken place by Mr. Pyles, the Bank might itself also be liable to appellant, under the principles set forth above, or, more accurately put, whether the complaint was sufficiently pled to withstand a challenge by the Bank under Rule 12 (b)(6) that would bar appellant from whatever benefits discovery might provide to clarify the entire picture of the transaction at issue.

It is true that, at the end of the day, review of a 12 (b)(6) dismissal is *de novo.* Here, however, having determined that the case must in any event be remanded to the trial as to Mr. Pyles, we are hesitant in this particular appeal and on the present record to forever bar the courthouse door to appellant vis-à-vis the Bank when the trial court has not itself addressed that issue with a full understanding of the controlling law. Moreover and importantly, because of the remand, this litigation as a whole is again in an ongoing posture, just as it would

have been had the trial court correctly refused to dismiss the case as to Mr. Pyles. No appeal could be taken on any aspect of the case until the proceedings had finally disposed of "all claims against all parties." *Farrow v. J. Crew Grp. Inc.*, 12 A.3d 28, 35 (D.C. 2011). We simply do not know what course further proceedings in this case may take, including future revelations that might cast more light on our uncertain knowledge of all aspects of the loan transaction.[17] For all these reasons, as we have done in the past in several contexts, we conclude that the preferable course of action here is to remand the entire case to the trial court. It will then have the opportunity in the first instance and with a correct understanding of the applicable legal principles to consider further the question of dismissal of the Bank in the context of an ongoing proceeding. *See, e.g., Bartel v. Bank of Am. Corp.*, 128 A.3d 1043, 1047-48 (D.C. 2015) (we "exercise our discretion to leave [those] issue[s] for resolution by the trial court in the first instance," quoting *Folks v. District of Columbia*, 93 A.3d 681, 686 (D.C. 2014)); *Crawford v. Katz*, 32 A.3d 418, 436 (D.C. 2011); *Clampitt v. American Univ.*, 957 A.2d 23, 42-43 (D.C.

---

[17] It is, for example, uncertain what further proceedings against Mr. Pyles, for example by deposition, may produce in the way of relevant evidence bearing on the liability of the Bank. The same may be said as to what further amendment of the complaint might bring out to expand upon the factual allegations relating to the totality of circumstances surrounding the making of the loan, albeit that most, if not all, of such unknown matters discussed above appear to lie beyond the ken of appellant without discovery.

2008) (although question of law, "we think it better to 'defer here to the trial court to address the matter in the first instance,'" (quoting *Concord Enters., Inc., v. Binder*, 710 A.2d 219, 223 n.6 (D.C. 1998)).

The dismissal of the complaint as to Mr. Pyles is reversed and the entire case is remanded for further proceedings consistent with this opinion. It is so ordered.[18]

---

[18] The complaint also claims violations of the federal Truth in Lending Act (TILA) and Equal Credit Opportunity Act (ECOA), as well as the District of Columbia Consumer Protection Procedures Act (CPPA), any one of which could potentially create liability apart from any fraud. The trial court dismissed the claims under the ECOA and the CPPA on the ground that the statute of limitations had run. However, this conclusion was based on its view that appellant should have discovered the fraud at the time of the execution of the documents, overlooking the confidentiality exception that might apply here. It also dismissed the TILA and CPPA claims on the grounds that the loan was not a "consumer" transaction within the several definitions in those acts. Given our lack of knowledge about the full circumstances of the loan and in light of the remand of this case for further proceedings, a definitive ruling on the applicability of these acts would seem premature at this point. The Bank also claims that appellant is attempting to "selectively" rescind the deed of trust and that she "ratified" the execution of that document by certain actions taken in connection with a settlement of other debts owed by Mr. Pyles and involving the home. But these assertions are in the nature of affirmative defenses apart from the sufficiency of the complaint, and rescission is not the only relief sought by appellant. The asserted facts also appear insufficient to unmistakably support these claims without further exposition.