*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 16-CV-1200

TAHMINA PROULX, APPELLANT,

V.

1400 PENNSYLVANIA AVENUE, SE, LLC, APPELLEE.

Appeal from the Superior Court of the
District of Columbia
(CAR-3639-14)

(Hon. Ronna Lee Beck, Trial Judge)

(Argued February 15, 2018                    Decided January 10, 2019)

*Marvin Liss* for appellant.

*Gary D. Wright* for appellee.

Before GLICKMAN and MCLEESE, *Associate Judges*, and RUIZ, *Senior Judge*.

RUIZ, *Senior Judge*: Tahmina Proulx appeals the trial court's determination that she is liable for breach of a contract for commercial property that was sold to her by appellee 1400 Pennsylvania Avenue, SE, LLC. Appellant argues that the court erred in (1) finding that the contract was not a contract of adhesion, and (2) concluding that the liquidated damages provision was valid. We affirm the judgment of the trial court.

**I.**

In February of 2012, Remy Esquenet, an attorney and real estate broker representing appellee, and Ken Noroozi, a real estate broker representing appellant, began negotiations regarding the lease and sale of a property located at 1400 Pennsylvania, SE in Washington D.C. Appellant's brother, Mian Amir, was also heavily involved in the contract negotiations. The property, a vacant ground floor retail unit and basement, was to be used by appellant, her brother, and their family for their family business, a pizza restaurant. While negotiating the sale of the property to appellant, appellee was in the process of incorporating as an LLC and purchasing the property from its previous owner.

On March 7, 2012, appellant and appellee entered into a commercial Contract of Purchase and Sale ("the Contract"), which provided that appellant would purchase the property for $550,000.[1] Under the terms of the Contract and pursuant to a Commercial Pre-Occupancy Agreement ("the Pre-Occupancy

---

[1] Appellant executed the contract through her brother, whom she authorized to sign on her behalf.

Agreement") attached to the Contract,[2] appellant would take possession of the property between March 15 and 26, 2012, and final settlement on the sale would take place during the twelve-month period after the first year of occupancy, i.e., March 2013 to March 2014.[3] The Contract called for a non-refundable $150,000 deposit, which would ultimately be credited towards the purchase price of

---

[2] Under the Pre-Occupancy Agreement, appellant would pay a monthly rent of $4,000 until the settlement on the purchase.

[3] Paragraph 6 of the Contract specifies that the "[p]ossession [d]ate . . . shall be as early as March 15th, 2012 or latest March 26th, 2012," and Paragraph 7 states that "Seller and Purchaser shall make full settlement of the purchase and sale (the 'Settlement') on or within twenty four (24) months but not earlier than twelve (12) months after the Possession Date, (the 'Settlement Date')." The Pre-Occupancy Agreement provides that the settlement date is to be "no earlier than April 1, 2013 and no later than March 31, 2014."

$550,000 at the time of settlement.[4]  The Contract also provided that, in the event

of breach by appellant, the $150,000 deposit would serve as liquidated damages.[5]

---

[4]  Paragraph 4(a) of the Contract reads, in relevant part:

> 4) Deposit
> a) The Purchaser shall deposit . . . the amount of [one] Hundred Fifty Thousand Dollars ($150,000) (the "Deposit"), payable to the Seller upon receipt by Seller of this Contract fully executed by the Seller and Purchaser. . . . This deposit is non-[re]fundable except in the event that the Seller defaults or in any way is unable to settle under the terms of this Contract. . . . The Deposit shall be applied as a credit to the Purchase Price [($550,000)].

[5]  Paragraph 18 of the Contract reads, in relevant part:

> 18) Performance
> a) If the Purchaser fails to perform under this Contract, the Deposit shall be forfeited to the Seller as the Seller's sole remedy and the Purchaser[] and Seller shall have no further liability to one another.  Seller and Purchaser acknowledge and agree that, (i) it would be extremely difficult to accurately determine the amount of damages suffered by Seller as a result of Purchaser's default; (ii) the Deposit constitutes a fair and reasonable amount to be received by Seller as agreed and liquidated damages for Purchaser's default under this Contract, as well as a fair, reasonable and customary amount to be paid as liquidated damages to a seller in an arm's length transaction of the type contemplated by this Contract upon a default by the purchaser; and (iii) receipt by Seller of the Deposit upon Purchaser's default shall not constitute a penalty or a forfeiture.

On March 12, 2012, appellee was incorporated as an LLC, and, on March, 13, 2012, appellee purchased the property from its previous owner for $465,000. Appellant then paid appellee the $150,000 deposit,[6] and, by March 26, 2012, took possession of the property.

Thereafter, the parties performed under the Pre-Occupancy Agreement: appellee paid property taxes and condominium fees, while appellant occupied and exercised control over the property, paying appellee $4,000 per month in rent before later falling delinquent. Appellant was also unable to close on the purchase before the final possible settlement date under the Contract: March 26, 2014.[7] In April of 2014, the property was vacant and no business was being conducted; on or around May 1, 2014, appellee changed the locks on the property.

On June 13, 2014, appellant filed a complaint alleging that the Contract should be rescinded and that the $150,000 liquidated damages provision was an

---

[6] The exact dates in March of 2012 on which the payment of the deposit occurred and on which appellee acquired the property from the previous owner were litigated before the trial court, but are not raised on appeal.

[7] While neither the record nor the briefs clearly establish why appellant was unable to close, Noroozi testified that Amir told him that he was "behind [on] the rent payment [and] . . . trying to get the money together." Amir also testified that he did not apply for a loan to assist him in making the closing payment.

unenforceable penalty and the deposit should be returned. Appellee filed a counterclaim alleging that appellant was in breach of the Pre-Occupancy Agreement, and owed $24,000 in past-due rent. Following a bench trial, the trial court ruled in favor of appellee on the complaint and counterclaim, finding that rescission of the Contract would be unjust, allowing the liquidated damages clause to stand, and holding that appellant owed appellee $24,000 for unpaid rent and $779 for the insurance purchased by appellee that had been appellant's responsibility, as well as attorney's fees and costs. Appellant filed this timely appeal.[8]

## II.

Appellant contends that the Contract is a contract of adhesion and that the trial court therefore erred in finding that the Contract was enforceable. "A contract of adhesion is defined generally as one imposed upon a powerless party, usually a consumer, who has no real choice but to accede to its terms." *Woodroof v. Cunningham*, 147 A.3d 777, 789 (D.C. 2016) (quoting *Andrew v. American Imp. Ctr.*, 110 A.3d 626, 633 n.8 (D.C. 2015)). Determining whether a contract is a

---

[8] Appellant does not challenge the trial court's ruling on the counterclaim (for unpaid rent and insurance premiums) or the award of attorney's fees; she challenges only the trial court's ruling on her complaint.

contract of adhesion is a fact-specific inquiry, in which the court examines the relative bargaining power of the parties and the circumstances under which the contract was negotiated and signed. *See Andrew*, 110 A.3d at 633 n.8, 637-38; *Moore v. Waller*, 930 A.2d 176, 182 (D.C. 2007) ("There must be a showing that the parties were greatly disparate in bargaining power, that there was no opportunity for negotiation *and* that the services could not be obtained elsewhere." (citation omitted)). We review the trial court's findings of fact for clear error. *See, e.g.*, *Boyd v. Kilpatrick Townsend & Stockton*, 164 A.3d 72, 78 (D.C. 2017); *Ballard v. Dornic*, 140 A.3d 1147, 1150 (D.C. 2016).

The trial court did not err in its determination that the Contract between appellant and appellee was not a contract of adhesion, but was a negotiated deal between parties of equivalent bargaining power. There were oral negotiations between the parties and multiple drafts of the Contract were sent back and forth between them. Appellant, Amir, and Noroozi testified that they were highly educated and experienced in real property transactions.[9] Because there was ample evidence in the record to support the trial court's finding that the bargaining

---

[9] The trial court noted that "Plaintiff has an undergraduate degree and a Master's Degree in business. Her brother to whom she delegated decision making has been running businesses for over 10 years and has been involved in negotiating leases previously. Plaintiff and her brother were represented by an experienced real estate broker, Mr. Noroozi . . . ."

process was fair, we discern no error in the trial court's determination that the Contract was not one of adhesion.

**III.**

Appellant makes the same argument, specifically addressed to the liquidated damages clause, arguing that it was unilaterally foisted into the Contract by appellee, and that the meaning of that provision was not explained to her. As discussed above, the Contract was negotiated between parties of equal bargaining power, so neither party acted unilaterally. While Noroozi, appellant's broker, testified that he "agreed to [the $150,000] be[ing] nonrefundable," i.e., the liquidated damages provision, because refusing would have been a "deal breaker" for appellee, his testimony makes clear that this occurred in the context of active negotiations between real estate professionals. As implied by the term "deal breaker," appellant was free to walk away if an agreement could not be reached. And while appellant testified that she did not read the Contract thoroughly or consult an attorney, but instead gave her brother full authority to sign the Contract on her behalf, she had a duty to familiarize herself with what she was signing. "We have . . . consistently adhered to a general rule that one who signs a contract has a duty to read it and is obligated according to its terms. . . . [A]bsent fraud or

mistake, one who signs a contract is bound by a contract which [s]he has an opportunity to read whether [s]he does so or not." *Pyles v. HSBC Bank USA, N.A.*, 172 A.3d 903, 907 (D.C. 2017) (quoting *Pers Travel, Inc. v. Canal Square Assocs.*, 804 A.2d 1108, 1110 (D.C. 2002)).[10] There is no factual or legal support for appellant's contention that the circumstances under which the liquidated damages clause was negotiated and agreed excuse her from being bound by its terms.

## IV.

Finally, Appellant asserts that the liquidated damages clause should not be enforced, as it is excessive and amounts to a penalty.

---

[10] Other jurisdictions have found similar evidence sufficient to establish that liquidated damages clauses were binding on the parties. *See, e.g., Fuqua Constr. Co. v. Pillar Dev., Inc.*, 667 S.E.2d 633, 635-36 (Ga. Ct. App. 2008) (holding an appellant's complaint that the appellee had "unilaterally foisted the language into the deal" was unfounded where parties to a "sales contract were experienced real estate developers and residential home builders"); *Jameson Realty Grp. v. Kostiner*, 813 N.E.2d 1124, 1132-33 (Ill. App. Ct. 2004) (finding the liquidated damages provision of a real estate brokerage contract was valid because it "was clear and unambiguous on its face" and defendant was "an experienced developer of residential real estate" who actively negotiated the agreement and could "not reasonably argue that he was not aware of the presence or import of this provision"); *Wilmington Tr. Co. v. Aerovias de Mexico, S.A. de C.V.*, 893 F. Supp. 215, 218 (S.D.N.Y. 1995) ("Relevant to [the liquidated damages bargaining] inquiry is the sophistication of the parties and whether both sides were represented by able counsel who negotiated the contract at arms length without the ability to overreach the other side.").

**A.**

"It is well-settled that parties to a contract may agree in advance to a sum certain to be forfeited as liquidated damages for breach of contract." *Burns v. Hanover Ins. Co.*, 454 A.2d 325, 237 (D.C. 1982). This is because a liquidated damages clause serves "to simplify the resolution of a breach of contract dispute" by "giving the parties an opportunity to resolve the damages question without resorting to litigation" and by "fix[ing] the measure of damages at the outset before a breach even occurs." *Vicki Bagley Realty, Inc. v. Laufer*, 482 A.2d 359, 367 (D.C. 1984). "Such a provision is particularly appropriate . . . where the damages . . . are uncertain in amount and cannot be easily ascertained." *Id.* (citation and internal quotation marks omitted).[11]

---

[11] *See also Priebe & Sons v. United States*, 332 U.S. 407, 411-12 (1947) ("Today the law does not look with disfavor upon 'liquidated damages' provisions in contracts. When they are fair and reasonable attempts to fix just compensation for anticipated loss caused by breach of contract, they are enforced. . . . They serve a particularly useful function when damages are uncertain in nature or amount or are unmeasurable . . . . And the fact that the damages suffered are shown to be less than the damages contracted for is not fatal. These provisions are to be judged as of the time of making the contract." (citations omitted)).

Thus, this court has held that a "liquidated damages clause is valid unless it is found to constitute a penalty," *Burns*, 454 A.2d at 327, and has adopted "the prevailing rule" that the burden is on "the party challenging [] enforceability . . . to establish that the liquidated damages clause was a penalty." *S. Brooke Purll, Inc. v. Vailes*, 850 A.2d 1135, 1138 (D.C. 2004) (citations and internal quotation marks omitted). As this court has recognized, "it has become increasingly difficult to justify the peculiar historical distinction between liquidated damages and penalties. Today the trend favors freedom of contract through the enforcement of stipulated damage provisions as long as they do not clearly disregard the principle of compensation." *Id.* at 1137 (quoting E. Allen Farnsworth, Farnsworth on Contracts § 12.18, 303-04 (3d ed. 2004)).[12]

To distinguish between enforceable liquidated damages provisions and unenforceable penalties, we consider the reasonableness of the terms of the liquidated damages clause, as compensation for breach, viewed as of the time and under the circumstances when it was agreed.

---

[12] *See also Priebe & Sons*, 332 U.S. at 413 ("All provisions for damages are, of course, deterrents of default. But an exaction of punishment for a breach which could produce no possible damage has long been deemed oppressive and unjust." (citation omitted)).

> If under the circumstances and expectations of the parties existing at the time of execution it appears that the provision is a reasonable protection against uncertain future litigation the provision will be enforced even though no actual damages were proved as of the date of the breach. If, on the other hand, it appears that the stipulation is designed to make the default of the party against whom it runs more profitable to the other party than performance would be, it will be void as a penalty. Thus, damages stipulated in advance should not be more than those which at the time of the execution of the contract can be reasonably expected from its future breach, and agreements to pay fixed sums plainly without reasonable relation to any probable damage which may follow a breach will not be enforced.

*Davy v. Crawford*, 147 F.2d 574, 575 (D.C. Cir. 1945). Because the touchstone is reasonableness as of the time of execution, "agreements to pay fixed sums plainly without reasonable relation to any probable damage which may follow a breach will not be enforced," *Order of AHEPA v. Travel Consultants, Inc.*, 367 A.2d 119, 126 (D.C. 1976) (citation and internal quotation marks omitted), and "liquidated damages must not be disproportionate to the level of damages reasonably foreseeable at the time of the making of the contract." *Council v. Hogan*, 566 A.2d 1070, 1072 (D.C. 1989). Thus, we have stated that "[t]he common law views liquidated damages clauses with a gimlet eye." *District Cablevision Ltd. P'ship v. Bassin*, 828 A.2d 714, 723 (D.C. 2003). Still, "[w]hen a liquidated damages provision is the product of fair arm's length bargaining, particularly between

sophisticated parties, common law suspicions may be eased and more latitude may be afforded the contracting parties to agree as they wish on the remedies for breach." *Id.* at 723-34. Using this framework, courts have generally upheld liquidated damages provisions.[13]

---

[13] *See S. Brooke Purll, Inc.*, 850 A.2d at 1139 (liquidated damages clause requiring homeowner to pay 35 percent of full contract price for cancellation of home improvement contract was not an unenforceable penalty because two thirds of the contract price represented materials and labor and one third represented the contractor's profit); *Vicki Bagley Realty, Inc.*, 482 A.2d at 367 (liquidated damages clause in contract for sale of home, which provided for forfeiture of purchaser's deposit if full settlement was not made, was reasonable because of the difficulty of measuring actual damages and mitigation of those damages — and thus the clause was not an unenforceable penalty); *Burns*, 454 A.2d at 327 (liquidated damages clause in construction contract, which stated that construction company must pay owners an amount corresponding to the length of the company's delay in completing the project and calculated based on actual costs, was not an unenforceable penalty); *Order of AHEPA*, 367 A.2d at 127 (liquidated damages clause in contract for travel services was not an unenforceable penalty, even though it provided for a fixed sum of $100,000 in the event of breach, when payments under the contract were to be made on a commission basis, as determining the precise amount of damages at the time of contracting would have been difficult); *Red Sage Ltd. P'ship v. Despa Deutsche*, 254 F.3d 1120, 1127-31 (D.C. Cir. 2011) (liquidated damages clause requiring commercial landlord to reduce tenant's rent by 50 percent for violating an exclusive covenant was not an unenforceable penalty because landlord's grant of a lease to a competitor business could cause significant and difficult-to-calculate losses to tenant's profits, new business opportunities, and goodwill); *cf. Falconi-Sachs v. LPF Senate Square, LLC*, 142 A.3d 550, 557-58 (D.C. 2016) (liquidated damages provision imposing a 10 percent late fee on rent paid more than five days late may be an unenforceable penalty such that a complaint should survive a motion to dismiss because tenant asserted that the breach is nominal, the fee is the same regardless of how late the payment is made after five days, and the fee is far higher than a reasonable forecast of damages); *District Cablevision Ltd. P'ship*, 828 A.2d at 724-25 (liquidated damages clause requiring cable customers to pay cable company a late fee that was

(continued . . . )

**B.**

We turn to the application of these principles to the liquidated damages provision in this case, which called for forfeiture of the $150,000 deposit in the event that appellant did not close on the purchase.[14]  Appellant argued at trial that, because appellee purchased the property for $465,000 and then agreed to sell it to appellant for $550,000 under the Contract, liquidated damages should have been capped at $85,000, as that was the amount appellee stood to lose if the sale was not completed.   Appellant also contends that the Contract price of $550,000 was $50,000 over market value at the time the Contract was executed (March of 2012), so actual damages from default would have been no more than $50,000 — and

_____

( . . . continued)
more than twice the actual cost to the company of processing late payments was not "shockingly disproportionate," but could still be construed as a penalty by a jury); *Council*, 566 A.2d at 1072-74 (liquidated damages clause providing that party defaulting on repayment of a $500 loan would have to turn over an $8,000 automobile may amount to a penalty and the trial court must gather further evidence); *Davy*, 147 F.2d at 575 (lease agreement "covenants [that] are so strictly drawn that the slightest slip on the part of the tenant will cause him to lose his entire equity," particularly in light of "[o]ther provisions in the contract [that] emphasize its unconscionable and overreaching character," amount to unenforceable penalties).

[14]   In the event that appellee defaulted on the sale, the $150,000 deposit would be returned to appellant.  See *supra* note 4.

thus, liquidated damages should have been capped at $50,000.[15]  In either case, appellant's argument is that liquidated damages in the amount of $150,000 should be void for excessiveness, as this amount is disproportionate to the damages foreseeable at the time of contracting, and that a damage award of $150,000 creates a situation in which it was more profitable to appellee for appellant to default than to go through with the sale contemplated in the Contract.  *See Davy*, 147 F.2d at 575.

The flaw in appellant's argument is that it equates liquidated damages, which are a prospective estimate set at the time of contract execution, with the benefit of the bargain if settlement had taken place at the outset, and with actual damages, which can be ascertained only after breach has occurred.  In evaluating the reasonableness of a liquidated damages clause, the court must assess the situation as of the time of execution of the contract and from the perspective of the negotiating parties looking at possible breach.  *See, e.g., Davy*, 147 F.2d at 575; *S. Brooke Purll, Inc.*, 850 A.2d at 1137-38; *Order of AHEPA*, 367 A.2d at 127; *see also Red Sage Ltd. P'ship*, 254 F.3d at 1127.

---

[15]  Appellant mentions the $50,000 figure for the first time on appeal, apparently based solely on Noroozi's statement at trial — unsupported by an appraisal or other documentation — that the property was worth $500,000.

As the trial court noted, the real estate market is unpredictable, and calculating how much appellee would be damaged if appellant defaulted could be an expensive proposition that, at best, would be only an educated guess. In this case, an accurate prediction was made particularly difficult because closing on the sale of the property could have taken place at any time during a twelve-month period that would not begin to run until one year after the Contract was executed. See *supra* note 3. Hence, the process of determining "damages to be ascertained," *S. Brooke Purll, Inc.*, 850 A.2d at 1138 (citation and internal quotation marks omitted), was simplified for both parties at the outset by agreeing to release all liability claims in exchange for retaining the deposit.

Appellant has not carried her burden to establish that the $150,000 amount of liquidated damages was a penalty. Appellant appears to contend that her breach caused only limited harm to appellee, presumably because appellee could have resold the property at a profit. At trial, Noroozi offered an upbeat assessment, testifying that the real estate market in the neighborhood where the property was located was going up during 2012, and that it was an "[i]mproving neighborhood" for commercial purposes.[16] But real estate markets might go up or down, and, in

---

[16] As with the $50,000 figure, see *supra* note 15, Noroozi's statement was unsupported by data or documentation.

early 2012, the parties may have reasonably decided to avoid the financial rollercoaster of prices they could not control by agreeing to an amount they could plan for. *See, e.g., Stanford Hotels Corp. v. Potomac Creek Assocs., L.P.*, 18 A.3d 725, 742 (D.C. 2011) ("It is generally known that in the last few years there have been wide fluctuations in the real estate market . . . .").

Moreover, even if the parties could have known for certain in 2012 that property values would rise, this would not necessarily mitigate the damages to appellee in case the sale did not go through due to appellant's breach. On the contrary, it is possible that, during the two years between execution of the Contract and the final settlement date, appellee would have to forgo an opportunity to sell the property at a profit greater than $150,000 — an opportunity that it might not be able to reclaim if and when appellant breached. From appellant's perspective, she fixed and capped her liability in the event of breach, a contingency that was entirely within appellant's control and that appellant might have described as an unlikely event. The fact that appellant's calculus did not play out as expected does not invalidate the bargain she struck. In addition, appellee would have incurred costs associated with carrying the property for up to twenty-four months and for selling the property to another buyer. Thus, from appellee's perspective, the

liquidated damages provision would have been necessary to guarantee a meaningful profit in the event of appellant's breach.

Given the complexities and uncertainties of the D.C. real estate market, as well as these additional costs, it is entirely possible that appellee's damages as a result of appellant's breach could have been in excess of $150,000. Thus, appellant has not borne her burden of showing that forfeiture of the deposit is a penalty because it exceeded reasonably expected damages at the time of execution or made default more profitable than performance. As there is no evidence that the parties were unequally matched in their negotiations, and the delayed closing contemplated under the Contract justified their agreeing on a liquidated damages clause up front to settle on ascertainable damages, the clause is valid and enforceable.

**V.**

We conclude that a full consideration of the record supports the trial court's determination that the Contract was not one of adhesion and that the $150,000 liquidated damages clause was not unreasonable under the circumstances. We

therefore affirm the trial court's ruling that appellee may retain the $150,000 deposit as liquidated damages for appellant's breach.

*Affirmed.*